## NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

## Antonino CARILLI, d/b/a Antonino's Restaurant, Respondent.

### No. 80–7070.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 10, 1980.

Decided June 22, 1981.

---

**6.** *See* pp. 60–61, 73–75, 82–83.

Robert Tendrich, Washington, D. C., for petitioner.

Stephen McKae, Moore, Sizoo & Cantwell, Oakland, Cal., for respondent.

Before MERRILL and SCHROEDER, Circuit Judges, and EAST,* District Judge.

EAST, District Judge:

The National Labor Relations Board (Board) petitions for enforcement of its order against Antonino Carilli, d/b/a Antonino's Restaurant (Antonino's). The Board found that Antonino's engaged in unfair labor practices in violation of Section 8(a)(1)[1] of the National Labor Relations Act (Act) by interrogating an employee about her Union[2] membership, suggesting that employees withdraw or resign from the Union, implying to employees that it would be futile to join or support the Union, and by unilaterally implementing a new medical and dental insurance program in order to discourage Union membership.

The Board also found that Antonino's had violated Sections 8(a)(1) and 8(a)(5)[3] of the Act by withdrawing recognition from the Union, refusing to negotiate, and unilaterally terminating certain payments to the employees' health and pension trust funds. The Board's order essentially directs Antonino's to cease and desist from committing

---

* Honorable William G. East, Senior United States District Judge for the District of Oregon, sitting by designation.

1. 29 U.S.C. § 158(a)(1).

2. Hotel, Motel, Restaurant Employees and Bartenders Union, Local 50, affiliated with Hotel and Restaurant Employees and Bartenders International Union.

3. 29 U.S.C. §§ 158(a)(1), 158(a)(5).

these and other unfair labor practices, to bargain with the Union upon request, and to pay delinquent contributions to the employees' trust funds.

We note jurisdiction pursuant to Section 10(e)[4] of the Act, and grant enforcement.

*FACTS*

Antonino Carilli and his wife, Jean, operate Antonino's Restaurant in Hayward, California. The Carillis' two sons, Larry and Tom, work respectively as assistant manager and chef. It is admitted that all of the Carilli family are supervisors within the meaning of Section 2(11)[5] of the Act, even though Larry and Tom Carilli were represented by the Union.

Antonino's first recognized the Union in 1972. Thereafter, Antonino's joined a multi-employer bargaining group, the East Bay Restaurant Association (Association), and subsequently became a party to a 1973–1978 collective bargaining agreement. That agreement had an expiration date of August 6, 1978, subject to timely notice of termination, and contained a provision for reopening for wage negotiations. The agreement also included provisions for employer contributions into separate, jointly-administered trust funds for the administration of programs providing health and pension benefits to covered employees. Antonino's abided by the contract's terms and contributed to the trust funds during the duration of the 1973–1978 contract.

In the spring of 1977, Antonino's gave timely notice to the Association that it was restricting the Association's authority to bargain on its behalf and that no changes or extensions to the contract were to be negotiated which would bind Antonino's beyond the August 6, 1978 termination date. The Association gave written notice to the Union of Antonino's action and thereafter negotiated a four-year extension of the 1973–1978 agreement, with various modifications concerning wages and benefits.

In June of 1978, Antonino's wrote the Union that it would terminate the collective bargaining agreement when it expired in August of 1978. The Union, apparently operating under the misconception that Antonino's was bound by the four-year extension of the 1973–1978 collective bargaining agreement, rejected Antonino's notice of termination as "untimely and unacceptable."

Prior to this exchange, the Carillis had engaged in some conversations with employees generally concerning the importance of insurance benefits and their relation to Union membership. Antonino's then contacted several insurance brokers concerning the purchase of medical and dental insurance programs for the employees to replace the existing Union-Association program upon expiration of Antonino's contract with the Union. On July 25, 1978, Antonino's authorized an insurance broker to purchase a medical and dental insurance program underwritten by Crown Life Insurance Company which would be effective August 6, 1978. Antonino's also arranged for the insurance broker to meet with the employees and explain the new insurance coverage.

When the collective bargaining agreement expired on August 6, 1978, Antonino's ceased making contributions into the health and pension trust funds. On August 11, 1978, employee Paul Dana Washburn prepared a handwritten decertification showing of interest petition and began circulating it. Over the next two days, Washburn collected 16 signatures on his petition, the last two of which were those of Larry and Tom Carilli. Washburn filed this petition with the Board on August 17, 1978.

On the morning of August 15, 1978, the insurance broker and Larry Carilli met with approximately 15 to 20 employees at the restaurant. Carilli announced to the employees that the restaurant's contract with the Union had terminated and that the restaurant was then "nonunion." He also stated that the employees could leave Antonino's to work in a Union restaurant if they desired but he wanted all employees to

---

4. 29 U.S.C. § 160(e).

5. 29 U.S.C. § 152(11).

stay on. Carilli also answered some questions generally concerning the employees' future status with the Union. The insurance broker distributed a document comparing insurance benefits under the Crown Life program with those under the 1973–1978 collective bargaining agreement, announced that the employees were covered by the Crown Life program, effective August 6, and told the employees that the new plan provided better benefits than the previous plan.

On August 28, 1978, however, the Union filed an unfair labor practice charge, alleging that Antonino's was refusing to bargain in good faith and that Antonino's was bound by the 1977–1982 extension to the collective bargaining agreement. The Board's regional director refused to issue a complaint on any aspect of the charge except the allegations concerning the unilateral implementation of the new health insurance plan, and rejected the Union's allegation that Antonino's was bound by the 1977–1982 agreement on the grounds that Antonino's had submitted a timely notification limiting the Association's bargaining authority on its behalf.

The Regional Director subsequently dismissed the decertification petition, ruling that no question of representation could be raised at that time because a complaint had issued against Antonino's charging that the unilateral replacement of the insurance programs violated Section 8(a)(5).

Over the next three months, the parties exchanged a number of letters and phone calls in which they discussed negotiating for a new contract. On the basis of these communications, the administrative law judge found that Antonino's had refused to engage in collective bargaining with the Union.

In January of 1979, the regional director notified the parties that the dismissal of the decertification petition had been rescinded. Shortly thereafter, however, the Union filed a second unfair labor practice charge and again demanded that Antonino's negotiate.

The regional director then notified the parties that the initial decertification petition was tainted by the participation of Antonino's supervisors in the signing of the petition, and that in light of the "numerous and serious" unfair labor practices allegedly committed by Antonino's just prior to the filing of the petition, no question of representation could be raised at that time. The Board affirmed.

The two unfair labor practice charges were consolidated and came to a hearing which resulted in the order which the Board now seeks to enforce.

*DISCUSSION*

I. *Sufficiency of the Complaint and Applicability of the Statute of Limitations*

Initially we must examine Antonino's contention that the complaint is insufficient and should be dismissed because it does not contain a clear and concise statement of the facts constituting the alleged unfair labor practices, as required by 29 C.F.R. § 102.-12(d).

The record discloses that the Union filed two charges, on August 25, 1978 and January 15, 1979. Both charges alleged that Antonino's violated Sections 8(a)(1) and 8(a)(5) of the Act, and both specifically allege that during the six months immediately prior to the filing of the charge, Antonino's refused to bargain in good faith with the Union. The charges each stated that "[b]y the above and other acts," Antonino's interfered with, restrained, and coerced employees in their exercise of their Section 7 rights.[6]

■ Actions before the Board are not subject to the technical pleading requirements of a private lawsuit. *North American Rockwell Corp. v. NLRB*, 389 F.2d 866, 870 (10th Cir. 1968). The charge need not be technically precise so long as it generally informs the party charged of the nature of the alleged violations, and the general allegations in the charge may later be supplemented or amplified by more specific allegations which "relate back" to the date the charge was filed.

6. 29 U.S.C. § 157.

The consolidated complaint in this matter, filed on February 28, 1979, contained specific allegations as to each unfair labor practice found by the Board. Thus Antonino's cannot successfully contend that it had no notice of the charges against it before the hearing. Moreover, the Board may find an unfair labor practice when the issue has been fully and fairly litigated even though no specific charge was made in the original complaint. *Clear Pine Mouldings, Inc. v. NLRB*, 632 F.2d 721, 728 (9th Cir. 1980); *NLRB v. Olympic Medical Corp.*, 608 F.2d 762, 763 (9th Cir. 1979). Here, Antonino's claims that it was prejudiced because the General Counsel's witnesses had incomplete memories concerning a statement by Larry Carilli at the August 15, 1978 employee meeting to the effect that Antonino's was nonunion. The Board found that this statement violated Sections 8(a)(1) and 8(a)(5). The record discloses that the substantially similar testimony of three witnesses supported the finding that Larry Carilli made the statement in question. Antonino's had the opportunity to cross-examine each of these witnesses on this issue, and did in fact cross-examine employee Mary Ingles specifically about the disputed statement. Ingles' testimony was clear and was given particular weight by the administrative law judge (ALJ). We find that the issue was fully and fairly litigated at the hearing and that Antonino's suffered no prejudice as a result of the lack of specificity in the original charge.

Antonino's speculates that because the original complaint contained no allegations concerning the interrogations of employees, solicitation of withdrawals and attempts to discourage Union membership, these matters must have first been brought to the Board's attention when the second charge was filed on January 25, 1979. Thus, Antonino's argues, the charges are barred by the Section 10(b)[7] six-month statute of limitations.

We note that even if this argument were accepted, only the charges based on the interrogation of one of the employees would be barred. The other charges upon which the findings of unfair labor practices were based grew out of the August 15, 1978 meeting, which was only five months before the second charge was filed.

But even as to the interrogation of the employee, the "by this and other acts" language of the original charge was sufficiently specific because it was amplified by the consolidated complaint, which related back to the date of that charge. *North American Rockwell Corp. v. NLRB*, 389 F.2d at 870. Because we find that the complaint is neither time barred nor fatally lacking in specificity, we turn to an examination of the Board's particular findings of unfair labor practices.

## II. Questioning an Employee About Union Membership

The Board found that during June or July of 1978, Jean Carilli asked employee Karen Bywater, a member of the Union, how important the employees' medical insurance program was for Bywater and whether she would be a Union member if she worked in a restaurant which offered its employees medical and dental insurance benefits. The Board also found that in June of 1978, Larry Carilli asked Bywater if she would need to be "in the Union" if Antonino's had a better medical and dental insurance program for the employees.

Antonino's attacks Bywater's credibility and contends that the conversations with Larry and Jean Carilli never occurred. The ALJ specifically credited Bywater's testimony. We will not overturn credibility determinations unless a clear preponderance of the evidence shows they are incorrect. *NLRB v. Inland Empire Meat Co.*, 611 F.2d 1235, 1238 (9th Cir. 1980). Here, Antonino's relies upon the fact that under cross-examination Bywater responded negatively when asked if she had had conversations with Larry and Jean Carilli "about the Union." The conversations in question focused primarily on insurance, not the Union, and thus Bywater's answers

7. 29 U.S.C. § 160(b).

on cross-examination cannot fairly be understood as contradicting her testimony concerning the conversations with the Carillis. Antonino's has failed to show by a clear preponderance of the evidence that the ALJ's assessment of Bywater's credibility was incorrect.

Antonino's next contends that the questioning of Bywater was entirely innocuous and was thus protected by Section 8(c) [8] of the Act which "defines and implements the First Amendment right of free speech in the context of labor relations." *NLRB v. Marine World USA*, 611 F.2d 1274, 1276 (9th Cir. 1980). Section 8(c) permits employers to express any views, arguments or opinions concerning Union representation which contain "no threat of reprisal or force or promise of benefit." 29 U.S.C. § 158(c). *NLRB v. Marine World, USA*, 611 F.2d at 1276.

In *Clear Pine Mouldings*, 632 F.2d at 725, this court stated:

> Interrogation of employees concerning union activities is not a per se violation of § 8(a)(1). *NLRB v. Super Toys, Inc.*, 458 F.2d 180, 182 (9th Cir. 1972). The test to determine if a § 8(a)(1) violation has occurred is whether, under all the circumstances, the interrogation reasonably tends to restrain or interfere with the employees in the exercise of their protected § 7 rights. *Penasquitos Village, Inc. v. NLRB*, 565 F.2d 1074, 1080 (9th Cir. 1977).

In applying this test, we must determine whether the interrogations are " 'associated with express or implied threats or promises, or form part of an overall pattern tending to restrain or coerce employees with regard to their protected activities.' " *NLRB v. Silver Spur Casino*, 623 F.2d 571, 584–85 (9th Cir.), *cert. petition pending*, —— U.S. ——, 101 S.Ct. 1973, 68 L.Ed.2d 294 (1980), *quoting Amalgamated Meat Cutters, etc., Local No. 364 v. NLRB*, 435 F.2d 668, 669 (9th Cir. 1970).

The Board found that the language used by the Carillis in these conversations was reasonably calculated to give Bywater the impression that Antonino's was considering instituting its own superior medical insurance program if the employees would not support the Union. The pattern of subsequent unfair labor practices, discussed below, lend credence to the Board's interpretation. Those practices included unilateral implementation of a new insurance program, withdrawal of recognition from the Union, and encouraging employees to withdraw from the Union.

 Although the surface innocuousness of the conversations here involved renders the question a close one, we agree with the Board's conclusion that viewed in their overall context, these conversations contained both promises of benefits for withdrawal of support for the Union and coercive implications that once the benefits were instituted, the employees were expected to either withdraw from the Union or find work elsewhere.

These conversations thus did not enjoy the protection of Section 8(c) and ran afoul of Section 8(a)(1).

III. *Suggestions that Employees Withdraw, Resign or Quit Paying Dues to the Union*

The Board found that Antonino's, through Larry Carilli, solicited employees to either withdraw or resign from the Union, and additionally suggested to one employee that she quit paying her Union dues. Antonino's does not dispute that such acts, if committed, would violate Section 8(a)(1), *see, e. g., NLRB v. Triumph Curing Center*, 571 F.2d 462, 470–71 (9th Cir. 1978), but instead contends that the Board has mischaracterized the statements which were in reality innocent and helpful responses to employees' questions, and were, therefore, protected speech.

This court has recently noted that "if there are conflicting interpretations of the facts, and the one adopted by the Board is supported by substantial evidence, the Court may not substitute a different inter-

8. 29 U.S.C. § 158(c).

pretation." *NLRB v. Anchorage Times Publishing Co.*, 637 F.2d 1359, 1363 (9th Cir. 1981).

The Board found that at his August 15, 1978 meeting with the employees, Larry Carilli stated that the restaurant was non-union and that the employees could leave if they wanted to work in a union restaurant. In reaching this conclusion, the Board relied upon the testimony of employees Karen Bywater and Mary Ingles. Bywater testified that Larry Carilli, when asked whether the employees could maintain their Union membership while working in a nonunion restaurant, responded that the employees could withdraw from the Union. According to Ingles, Larry Carilli told the employees that "those of us who wanted to stay here, go ahead and take a withdrawal from the Union." Ingles also testified that a day or two after the August 15th meeting, she informed Larry Carilli that she had requested a "withdrawal card" from the Union, but her request had been denied. Larry Carilli responded that there were "other ways" that Ingles could go about withdrawing from the Union; for example, by resigning or ceasing to pay her dues, but that it was up to her to make her own decision.

■ The Board concluded that once Antonino's announced its intent to operate without a union, it was entirely foreseeable that the employees would ask questions concerning their future status vis-v-vis the Union, and that the responses were designed to undermine the Union. This conclusion is buttressed by Antonino's admitted earlier decision to "get rid of the Union." We find that the Board's conclusion is supported by substantial evidence.

## IV. Termination of Payments to Employee Trust Funds and Unilateral Implementation of New Insurance Plans

The Board found that Antonino's violated Sections 8(a)(1) and 8(a)(5) of the Act by unilaterally terminating its payments to the labor-management health and pension trust funds, and by implementing new medical and dental insurance plans in place of the health trust fund plan.

Antonino's first defends its termination of payments to the labor-management trust funds on the grounds that continued payments would have violated Section 302(c)(5) of the Act.[9] Section 302(c)(5) prohibits payments by employers to employee representatives unless those payments are made pursuant to a specific written agreement covering the payments, and such payments are for the exclusive benefit of the employees and their families and dependents. Antonino's argues that the expiration of its collective bargaining agreement with the Union left it without the necessary written agreement, and that it, therefore, could not continue making the payments without incurring criminal liability under Section 302(c)(5).

■ It is clear from the collective bargaining agreement that the trust fund agreements remained in effect for the other members of the Association who became parties to the 1978–1982 extension to the collective bargaining agreement. There is no dispute that those documents were adequate written agreements under Section 302(c)(5) so long as Antonino's was subject to the collective bargaining agreement and the trust agreements are sufficient to satisfy the requirements of Section 302(c)(5). *Peerless Roofing Co. v. NLRB*, 641 F.2d 734

---

**9.** Section 302 of the Act, 29 U.S.C. § 186, provides in relevant part:

§ 302(a) It shall be unlawful for any employer ... to pay, lend, or deliver ... any money or other thing of value—

\* \* \* \* \* \*

(2) to any labor organization, or any officer or employee thereof, which represents ... any of the employees of such employer ....

\* \* \* \* \* \*

(c) The provisions of this section shall not be applicable ... (5) with respect to money or other thing of value paid to a trust fund established by such representative, for the sole and exclusive benefit of the employees of such employer, and their families and dependents ... Provided, That ... (B) the detailed basis on which such payments are to be made is specified in a written agreement with the employer ....

29 U.S.C. § 186.

(9th Cir. 1981).[10] In that case we noted that the collective bargaining agreement survives its expiration date for purposes of marking the status quo as to wages and working conditions. The employer is required to maintain that status quo following the expiration of the collective bargaining agreement until the parties negotiate a new agreement or bargain in good faith to impasse. *Clear Pine Mouldings, Inc. v. NLRB*, 632 F.2d at 729. In *Peerless*, we noted that "[i]f the employer's obligation to make trust fund payments were terminated by the expiration of the bargaining agreement, the union would never have an opportunity to bargain over those contributions," at 736, and concluded that such a result would be contrary to the national labor policy as embodied in the Act.

By finding that the expired collective bargaining agreement and the trust agreements here are sufficient to permit continued payments to the trust funds, we do not, as Antonino's contends, hinge criminal liability under Section 302(c)(5) upon the difficult determination of whether impasse has been reached. The collective bargaining and trust agreements here are sufficient to satisfy the requirements of Section 302(c)(5) and to permit continued payments to the trust funds, whether or not the parties have bargained to impasse.

Antonino's next argues that it was free to make unilateral changes in its medical, dental, and pension plans, and to withdraw recognition from the Union because the Union no longer enjoyed the majority support of Antonino's employees.

■ Voluntary recognition having been accorded the Union in 1972, there is a rebuttable presumption that the Union enjoys majority status. *NLRB v. Tahoe Nugget, Inc.*, 584 F.2d 293, 297 (9th Cir. 1978), *cert. denied*, 442 U.S. 921, 99 S.Ct. 2847, 61 L.Ed.2d 290 (1979); *Sahara-Tahoe Corp. v. NLRB*, 581 F.2d 767, 769–70 (9th Cir. 1978), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2837, 61

L.Ed.2d 284 (1979). The employer who seeks to withdraw recognition must rebut this presumption with a clear, cogent and convincing showing of either an actual loss of majority status or objective factors sufficient to support a reasonable good faith doubt of the Union's majority. *NLRB v. Tahoe Nugget, Inc.*, 584 F.2d at 297.

Antonino's relies upon a petition signed by 16 of the employees, including Larry and Tom Carilli, to establish the Union's loss of majority status. Antonino's, however, offered no independent evidence of the number of employees in the bargaining unit, but instead relies upon a statement in the decertification petition that there were 26. The General Counsel did not offer the decertification petition, which was filled out by employee Washburn, into evidence for the purpose of establishing the truth of what it alleged concerning the number of employees in the bargaining unit, and Antonino's made no attempt to show that it was accurate. Under these circumstances, we cannot say that the evidence of loss of majority support was clear, cogent, and convincing.

■ Antonino's complains, however, that the ALJ prevented it from further litigating the issue of majority status by precluding it from litigating the question of whether the showing of interest petition was adequate to support the decertification petition. The adequacy of a showing of interest petition is an administrative matter which may not be litigated by the parties. *See, NLRB v. J. I. Case Co.*, 201 F.2d 597, 600 (9th Cir. 1953).[11] The mere fact that Antonino's was properly prevented from litigating the adequacy of the showing of interest petition does not mean that it was precluded from litigating the majority status issue, even though certain evidence may have been relevant to both issues. The record reveals that Antonino's simply never offered any evidence as being relevant to

---

10. *Accord, Denver Metro Ass'n v. Journeymen Plumbers*, 586 F.2d 1367, 1373 (10th Cir. 1978); *Hinson v. NLRB*, 428 F.2d 133, 139 (8th Cir. 1970).

11. *Accord, NLRB v. P. A. F. Equipment Co.*, 528 F.2d 286, 287 (10th Cir. 1976); *NLRB v. Air Control Products*, 335 F.2d 245, 250 (5th Cir. 1964).

the majority status issue, and thus supports the ALJ's statement that he did not prevent Antonino's from litigating that issue.

Further, even if Antonino's had introduced evidence indicating the number of employees in the bargaining unit, its contention that the Union lacked majority status would nonetheless be based upon a showing of interest petition which was not circulated until August 11, 1978. There is no evidence that the Union lacked majority status when Antonino's authorized its insurance broker to purchase a new insurance policy on July 25 which was to become operative on August 6, or when Antonino's ceased making payments to the trust funds on August 6.

 Nor does the record support a finding of good faith doubt as to the Union's majority status. Good faith doubt must be evaluated as of the time the refusal to bargain occurs. *NLRB v. Tahoe Nugget, Inc.*, 584 F.2d at 301 n.25. Antonino's has not shown that it had any grounds for doubting the Union's majority status at the time the unilateral changes were made.

Antonino's next contends, however, that it was not required to give the Union notice and an opportunity to negotiate about the changes in insurance plans, because to do so would have been futile. This argument is based upon both a July 6, 1978 letter from the Union to Antonino's which erroneously asserted that Antonino's was bound by the 1977–1982 extension to the collective bargaining agreement, and the Union's alleged failure to request negotiations on the insurance issue once it learned of the changes. The Board rejected this contention, noting that Antonino's had expressed its intention to "drop the Union" and institute new insurance programs before the Union expressed its erroneous belief that Antonino's was bound by the 1977–1982 collective bargaining agreement.

The Board found that Antonino's unilateral action was motivated by a desire to undermine the Union, and that Antonino's

had never indicated to the Union that it intended to make the insurance policy changes. In addition, the Board found that Antonino's rejected an invitation to meet with the Union and discuss its position. It is clear from the record that Antonino's failure to accord the Union an opportunity to bargain was not motivated by the Union's position, and it is equally clear that the Union's position was not so intransigent as to relieve Antonino's of its obligation to extend an opportunity to negotiate before instituting unilateral changes in mandatory subjects of bargaining.

Finally, Antonino's contends that it had no duty to bargain concerning its unilateral termination of payments to the pension fund. Antonino's relies upon *Seattle First National Bank v. NLRB*, 444 F.2d 30, 32–33 (9th Cir. 1971) in which this court held that in order for a matter to be a mandatory subject of collective bargaining, it must materially or significantly affect the terms or conditions of employment.[12] That case involved a bank's termination of a little used free investment counseling service for its employees. This court found no duty to bargain about the termination of such services, noting that they were of value only to a small number of employees actively trading in securities and were not the type of services traditionally associated with terms and conditions of employment. Further, the termination of the free investment counseling services was part of an overall restructuring of rates which the bank charged its customers, and was, therefore, characterized as a management decision which affected the employees only indirectly.

 The Union's pension plan here by contrast is not limited to a small number of employees, and is not the type of matter typically entrusted solely to management discretion. Pension plans are traditionally associated with terms and conditions of employment, and we find that Antonino's vio-

---

**12.** It is undisputed that the medical and dental plans provided under the labor-management health trust fund are mandatory subjects of bargaining. *See, e. g., Clear Pine Mouldings, Inc. v. NLRB*, 632 F.2d 721, 729 (9th Cir. 1980).

lated Sections 8(a)(1) and 8(a)(5) by unilaterally terminating its payments to the Union's pension trust fund.

## V. Refusal to Meet and Bargain with the Union

██ The Board found that subsequent to the unfair labor practices previously discussed, Antonino's violated Sections 8(a)(1) and 8(a)(5) by refusing to meet and bargain with the Union about a new collective bargaining agreement from November 20, 1978 to January 19, 1979. This finding, which is based upon a series of communications between Antonino's and the Union, is supported by substantial evidence.

Antonino's urges, however, that it was not required to meet and bargain because it had learned [13] that a decertification petition was pending during the period in question. The Board's decision in *Telautograph Corp.*, 199 NLRB 892 (1972), relied upon by Antonino's, held that where a decertification petition has been filed and there is no evidence of previous unfair labor practices which may have caused a decline in Union support, the employer must discontinue bargaining with the Union until the question of representation has been settled by the Board. Antonino's contends that the *Telautograph* doctrine is applicable here because the Board found that the circulation and filing of the decertification petition were not caused by any actions of Antonino's.[14]

The Board, however, ruled that this defense was unavailable here because Antonino's had committed unfair labor practices designed to undermine the Union which precluded a fair decertification election. We agree. The underlying issue is whether the employer had a reasonable good faith doubt as to the Union's majority status. "Reasonable doubt as to majority status must only be asserted in good faith

and may not be raised in the context of an employer's activities aimed at causing disaffection from the Union." *Clear Pine Mouldings, Inc. v. NLRB*, 632 F.2d at 730. The fact that the unfair labor practices here did not cause the circulation or filing of the petition is of little moment. No showing was made that a majority of the employees supported decertification before learning of Antonino's previous unfair labor practices and being exposed to Antonino's subsequent unfair labor practices. Because Antonino's by its actions precluded a fair determination of the majority status issue, it cannot now rely on the reasonable good faith doubt defense.

## VI. The Bargaining Order

Antonino's maintains that the Board abused its discretion by issuing a bargaining order, because the unfair labor practices committed here were not so flagrant as to prevent a fair decertification election, and because a majority of the employees oppose representation by the Union. We disagree.

In *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 614, 89 S.Ct. 1918, 1940, 23 L.Ed.2d 547 (1969), the court held that bargaining orders are not limited to cases involving outrageous and pervasive unfair labor practices, but may be imposed "in less extraordinary cases marked by less pervasive practices which nonetheless still have the tendency to undermine majority strength and impede the election processes." If there is a showing that the Union once had a majority support, and the likelihood of erasing the effect of the unfair labor practices and obtaining a fair election by the use of traditional remedies is light, a bargaining order may be warranted. Because the Board possesses specialized knowledge and expertise, we must accord special respect to its estimates of the effects of the unfair labor

---

**13.** Antonino's learned of the existence of the decertification petition on August 12, 1978, after the unilateral exchange of insurance plans, but before the refusal to bargain from November 20, 1978 to January 19, 1979.

**14.** Although Antonino's had committed unfair labor practices by withdrawing recognition from the Union, terminating payments to the

Union trust funds, and instituting a new insurance plan on August 6, 1978, the employees were not aware of these actions until August 15, about three days after the decertification petition was circulated. The earlier interrogation of employee Bywater did not taint the petition because she did not sign it.

practices on the election process, and to its choice of remedies. *Id.* at 612 n.32, 89 S.Ct. at 1939 n.32.

Here, in addition to giving clear indications to the employees that it intended to operate without a Union and suggesting that the employees either resign from the Union or seek work elsewhere, Antonino's implied that better medical and dental benefits would be available without the Union and actually implemented those benefits. The Board's determination that these acts precluded a fair decertification election is supported by substantial evidence.

Antonino's maintains, however, that a bargaining order is inappropriate here because it will impose a minority Union upon the employees. This contention is based upon a letter written three days after the hearing which expressed opposition to the Union and was purportedly signed by 13 of the 18 employees allegedly in the bargaining unit at that time. The Board denied a motion to reopen the proceedings to permit introduction of the letter.

We find no error in the Board's denial of the motion to reopen. The motion was not filed until more than three months after the letter was written and more than a month after the ALJ had rendered his decision. No excuse is offered for the delay. In addition, there is no allegation that the identity of the employees remaining in the bargaining unit or the identity of the supervisors had changed, and thus there is no evidence that the effects of the unfair labor practices had diminished by the time the letter was written. *See NLRB v. Peninsula Ass'n for Retarded Children and Adults,* 627 F.2d 202 (9th Cir. 1980). Therefore, there is nothing to suggest that an untainted majority of the employees ever expressed opposition to the Union.

This case is distinguishable from *Daisy's Originals, Inc. v. NLRB,* 468 F.2d 493 (5th Cir. 1972), relied upon by Antonino's, which held that a bargaining order was not warranted where the unfair labor practices committed were merely technical violations of the Act which did not dissipate the Un-

ion's majority and did not prevent a fair decertification election. Here, the unfair labor practices were more numerous and more serious, and prevented the possibility of a free expression of the employees' choice in a fair decertification election.

VII. *The Repayment Order*

The Board's order requires Antonino's to repay all the payments to the trust funds which have been withheld since August 6, 1978, and to continue such payments until Antonino's negotiates in good faith to a new contract or impasse, unless the Union fails to make a written request within 60 days of the order that Antonino's replace the Crown Life plan with the previous program.

Antonino's complains that because it provided the employees with better medical and dental insurance than was provided under the Union's plan, the repayment order is punitive and is, therefore, an impermissible attempt to effectuate policies other than those of the Act. *See Fibreboard Paper Products Corp. v. NLRB,* 379 U.S. 203, 216, 85 S.Ct. 398, 405, 13 L.Ed.2d 233 (1964).

We find nothing punitive in this order. The Board's order merely requires that Antonino's repay what it has unlawfully withheld. It was Antonino's which unlawfully chose to incur the additional expense of a private insurance program in its attempt to undermine the Union, and it cannot now complain that it incurred a loss in so doing.

The Board's order is enforced.

ENFORCED.