665 F.2d 970
 109 L.R.R.M. (BNA) 2564, 92 Lab.Cas. P 13,196
 Gordon L. RAYNER and Frank H. Clark, d/b/a Bay Area Sealers
and Bay Area Sealers, Inc., Petitioners and
Cross-Respondents,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent and Cross-Petitioner,
and
Auto, Marine and Specialty Painters Union, Local No. 1176, Intervenor.
 Nos. 80-7486, 80-7612.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted July 16, 1981.
Decided Jan. 15, 1982.
 
 Maureen E. McClain, Littler, Mendelson, Fastiff & Tichy San Francisco, Cal., argued for petitioners and cross-respondents; David A. Rosenfeld, Van Bourg, Allen, Weinberg & Roger, San Francisco, Cal., on brief.
 Victoria Higman, Washington, D. C., argued for respondent and cross-petitioner; Howard E. Perlstein, Washington, D. C., on brief.
 Petition for Review and Cross Application for Enforcement of an Order of the National Labor Relations Board.
 Before ANDERSON, NELSON and NORRIS, Circuit Judges.
 J. BLAINE ANDERSON, Circuit Judge:
 
 
 1
 Gordon Rayner and Frank Clark, business partners doing business as Bay Area Sealers (the Company), petition for review of a decision and order of the National Labor Relations Board (the Board), 251 N.L.R.B. 89, finding that they have violated §§ 8(a)(1) and (5) of the National Labor Relations Act (the Act), 29 U.S.C. §§ 158(a)(1) and (5) (1976), by refusing to recognize and bargain with the Auto, Marine & Specialty Painters Union Local No. 1176 (the Union) as the exclusive bargaining agent for an appropriate unit of the Company's employees. The Board cross-applies for enforcement of its order, and the Union intervenes in support of the application for enforcement. Substantial evidence supports the Board's determination that the Company engaged in unfair labor practices. The Board's remedial order, as modified by this opinion, is enforced.
 
 I. FACTS
 
 2
 The Company was formed in August, 1974, to perform asphalt seal coating and surface repair work. Between the date of Company formation and May, 1975, the Company completed a number of projects, including the coating of floors at the Dow Chemical plant in Pittsburg, California. The Company obtained employees from the State Employment Development Department, and most of the workmen so obtained had no prior experience in sealing work or in construction work generally. While workmen were hired for specific projects, they were told that if the Company had another job at completion of the project for which they were hired, they would be given preferential treatment for work in the newly-obtained jobs.
 
 
 3
 In March, 1975, Leslie Moore, the Union's business representative, was apprised of the fact that the Company's nonunion crew was working at the Dow plant in Pittsburg. Shortly thereafter, Company partner Frank Clark and Moore informally agreed that the Union would "release" the Dow project and permit completion of the sealing job with nonunion labor in consideration for the Company's obligation to negotiate a collective bargaining agreement with the Union at an unspecified future date.
 
 
 4
 In early May, 1975, a group of the Company's employees sought Union representation and, according to Moore,[1] four Company employees signed union representation authorization cards. Moore then arranged a meeting on May 14, 1975, with Rayner and Clark, at which time Clark signed, on behalf of the Company, a 1973-1975 collective bargaining agreement (the Agreement) between the Union and the Parking and Highway Improvement Contractors Association (the Company was not a member of the Association). Since the Company was getting started in the business, Moore and Clark reached an informal agreement at the meeting that the provisions of the Agreement would not be enforced against the Company until it had obtained some significant contract awards.
 
 
 5
 The Agreement signed by the Company contained an automatic renewal provision, and on July 15, 1975, the Union notified the Company that the Agreement would be "opened" for modification, but would be renewed in its present form absent Company disapproval. The Company did not respond to this notice and, according to the renewal provision of the prior Agreement, the contract was renewed for a three-year period extending from October 1, 1975, to October 1, 1978.
 
 
 6
 In July of 1976, Moore learned that the Company had obtained some substantial contracts and notified the Company that the Union then considered the Company bound by the Agreement's terms. Failing to get the Company's response to both telephone and mail notices, the Union invoked the Agreement's grievance procedure and requested the Company to meet on July 27, 1976, with a joint employer-labor conference board to resolve the dispute. After being notified that Company representatives would not attend the scheduled conference, the Union filed unfair labor practice charges with the Board.
 
 
 7
 In March of 1978, the Union asked to inspect the Company's payroll records for the 1976-1977 period, and this request was denied by the Company. On June 20, 1978, the Company notified the Union that it considered any Agreement with the Union terminated (without prejudice to the Company's position that no binding agreement was in effect), and offered to negotiate with the Union toward the goal of entering a new collective bargaining agreement. The Union rejected the Company's offer.
 
 
 8
 At the first administrative hearing, the Administrative Law Judge (ALJ) found that the Union had been at all relevant times and remains the exclusive representative of the employees in the relevant bargaining unit and found that the Company had engaged in unfair labor practices as charged. The ALJ issued a cease and desist order and ordered the Company to make whole all unit employees and Union funds for losses incurred during the period extending from the date of the repudiation of the Agreement, June, 1976, to October 1, 1978, the termination date of the Agreement.
 
 
 9
 The Company then filed exceptions to the ALJ's decision with the Board and advanced an argument that the Company was engaged in the building and construction industry and that the Agreement was a non-binding "pre-hire" agreement under section 8(f) of the Act, 29 U.S.C. § 158(f) (1976). The Company sought dismissal of the charges.
 
 
 10
 In March of 1978, the Union filed the second unfair labor practice charge for the Company's refusal to allow the Union to inspect the Company's payroll records. The Board consolidated the cases and ordered further proceedings before an ALJ concerning whether the Company was engaged in the building and construction industry and whether its section 8(f) claim had merit. After receiving evidence on the pre-hire issue, the ALJ, in a supplemental decision, found that the Company was engaged in the building and construction industry, but affirmed his prior finding that the Union was the majority representative of the relevant employee unit during the relevant period. These latter findings constituted a rejection of the Company's section 8(f) argument that it was not bound by the Agreement since the Union, as majority representative, had the power to bind the Company, regardless of the pre-hire issue.
 
 
 11
 The Board reviewed the record produced at the two hearings and affirmed the ALJ's determination that the Union was the majority representative of the full-time and regular part-time crew members of the relevant bargaining unit on May 14, 1975.[2] The Board accordingly concluded that the Company had violated section 8(a)(5) and (1) of the Act by refusing to recognize and bargain with the Union, by making unilateral changes in employee fringe benefit programs, by refusing to make payments to union trust funds, and by refusing to grant the Union's request to review the Company's payroll records.
 
 
 12
 The Board, however, modified the ALJ's remedial order. Citing the Company's prolonged unilateral refusal to comply with the terms of the Agreement, and its failure to make a timely request to bargain over changes it made unilaterally, the Board ordered the make whole remedies to continue beyond the termination date of the Agreement until the Company complied with the terms of the Agreement or bargained in good faith to an impasse.
 
 II. DISCUSSION
 A. The Nature of the May 14, 1975 Agreement
 
 13
 The Company does not challenge the Board's findings that it repudiated the contract which it had signed; instead, the Company claims that its bargaining obligation under section 8(a)(5) and (1), 29 U.S.C. § 158(a)(5) and (1), never arose because the Union allegedly did not represent the majority of the bargaining unit employees before the Company signed the collective bargaining agreement on May 14, 1975.
 
 
 14
 When an employer pleads in defense to a refusal-to-bargain charge that the union was not authorized to bargain by a majority of the unit employees before the contract was signed, he in essence relies on his commission of an unfair labor practice. Ordinarily, an employer violates section 8(a)(2) and (1) of the Act, 29 U.S.C. § 158(a)(2) and (1), by entering into a bargaining agreement before the union has acquired the support of a majority of the unit employees. International Ladies' Garment Workers' Union v. NLRB, 366 U.S. 731, 81 S.Ct. 1603, 6 L.Ed.2d 762 (1961). Such a defense is usually barred by section 10(b) of the Act, 29 U.S.C. § 160(b) (1976). To avoid the reach of section 10(b), the Company argues that its recognition of the Union did not violate section 8(a)(2) because it was legally privileged under section 8(f)[3] of the Act to enter into an agreement with a minority union.[4]
 
 
 15
 Section 8(f) does not advance the Company's position because we find substantial evidence on the record as a whole to support the Board's finding that the Union represented a majority of the unit employees before the contract was executed. Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); NLRB v. Randall P. Kane, Inc., 581 F.2d 215, 218 (9th Cir. 1978); Section 10(e) of the Act, 29 U.S.C. § 160(e) (1976). To review the Board's determination that the Union acquired a majority status of the appropriate bargaining unit, we must review the evidence to determine (1) whether the Board's finding of the appropriate bargaining unit was correct, and (2) whether the evidence supports the finding that, within the appropriate bargaining unit, the Union represented a majority of the employees prior to the signing of the Agreement.[5]
 
 
 16
 The determination of an appropriate bargaining unit "is a matter committed to Board discretion, see § 9(b), National Labor Relations Act of 1947, 29 U.S.C. § 159(b), and a bargaining unit determination should not be overturned unless the Board has abused its discretion." Spring City Knitting Co. v. NLRB, 647 F.2d 1011, 1013 (9th Cir. 1981). The Board found six employees to be within the unit comprised of all Company full-time and regular part-time employees on the date of the signing of the Agreement.
 
 
 17
 The Company first argues that the Board incorrectly limited the scope of the unit to all "full-time and regular part-time" employees of the Company on May 14, 1975, because the Company only hired employees on a job-by-job basis and a more liberal construction industry scope of relevant unit should have been applied. In considering this argument, the ALJ found that all employees hired by the Company in early 1975 were informed that they would receive preference for future jobs and concluded that "there can be no doubt ... that (the Company's) partners have consistently striven to recruit 'regular' employees, whose availability for continued service in (the Company's) hire-from project to project-could be counted on, so long as the firm had work currently in progress or foreseeably in prospect." 251 N.L.R.B. at 128. We agree with the Board that substantial evidence supports this finding that the Company did hire workmen on a regular basis which supports the Board's limitation on the scope of the relevant employee bargaining unit.
 
 
 18
 The Company further argues that even if the Board's definition of the appropriate bargaining unit was correct, that it should have included three additional employees for a total of nine which would render the four card signers a minority.
 
 
 19
 We have reviewed the record and do not find evidence to support a conclusion that the Board abused its discretion in finding a six-member employee unit. Spring City Knitting, supra. Employee Fuqua had disappeared from the job approximately a month prior to the May 14 meeting and there was no evidence that he had any reasonable expectation of reemployment as of May 14. Likewise, evidence is lacking to support any conclusion that employee Staron was still working for the Company on May 14, and the evidence shows that employee Torrez was working only sporadically during the weeks prior to the signing of the Agreement and resigned shortly thereafter.
 
 
 20
 The Company's objections to the finding of majority status of the Union within the relevant bargaining unit is basically an issue with the ALJ's determinations that, for the most part, Union representative Moore's testimony was more credible than that of Rayner.[6] We do not reject such credibility determinations unless a clear preponderance of the evidence demonstrates that they are incorrect. NLRB v. Carilli, 648 F.2d 1206, 1211 (9th Cir. 1981); NLRB v. Inland Empire Meat Co., 611 F.2d 1235, 1238 (9th Cir. 1980). Our review of the record finds no such preponderance of the evidence to disturb the Board's adoption of the ALJ's finding that the Union enjoyed a majority status within the relevant employee unit at the relevant time. The Company was, therefore, bound by the provisions of the Agreement.[7] The Company's failure to recognize the Union, its failure to bargain, its unilateral changes in terms and conditions of employment, its failure to contribute to applicable union trust funds, and its refusal to allow the Union to inspect its payroll records all constitute unfair labor practices as proscribed by section 8(a)(5) and (1) of the Act.
 
 B. The Make Whole Remedy
 
 21
 In a supplemental decision, the ALJ ordered the Company to cease and desist from its actions in refusing to recognize and bargain with the Union and from refusing to allow inspection of its payroll records. The ALJ also ordered the Company to make whole the employees and applicable Union trust funds for losses incurred during the period extending from June, 1976, to October 1, 1978, the applicable term of the Agreement. The Board, however, modified the make whole remedy portion of the ALJ's remedial order by ruling that the Company had a "continuing obligation to apply the terms and conditions of the terminated contract ...," 251 N.L.R.B. at 90, "until (the Company) negotiates in good faith with the Union to an agreement or to an impasse." 251 N.L.R.B. at 91.
 
 
 22
 The Company challenges this modification which imposes upon it a continuing make whole liability. It argues that the order is not within the Board's authority because it is punitive, that the Company properly notified the Union of its intent to bargain for a new contract and the Union failed to respond. The Company argues further that enforcing the Board's order under the circumstances of this case would undermine an employer's right to seek review of a Board order because the burden of continuing liability, in the face of the Union's refusal to respond to the Company's offer to negotiate a new contract, compels the Company to abide by the terms of the Board's order rather than seek review.[8] We enforce the portion of the remedial order which requires the Company to make whole the employees and funds for losses incurred during the term of the Agreement; however, we agree with the Company that the portion of the make whole remedy that compels continuing liability beyond the termination date of the Agreement is punitive and cannot be enforced.
 
 
 23
 While we recognize that the Board's remedial power is "a broad discretionary one, subject to limited judicial review," Fibreboard Corp. v. NLRB, 379 U.S. 203, 216, 85 S.Ct. 398, 406, 13 L.Ed.2d 233, 241 (1964), including the discretion to order back pay or make whole remedies, NLRB v. Bridge, Structural and Ornamental Iron Workers Local 433, 600 F.2d 770, 777 (9th Cir. 1979), cert. denied, 445 U.S. 915, 100 S.Ct. 1275, 63 L.Ed.2d 599 (1980), we are not a "rubber stamp" for the Board's remedial decisions, NLRB v. Chatfield-Anderson Co., 606 F.2d 266, 268 (9th Cir. 1979). In exercising our limited powers of review, we reiterate that the Board has no power to order remedies that are in fact punitive rather than compensatory. Local 60, United Brotherhood of Carpenters v. NLRB, 365 U.S. 651, 655, 81 S.Ct. 875, 877, 6 L.Ed.2d 1, 4 (1961); NLRB v. Fort Vancouver Plywood Co., 604 F.2d 596, 602 (9th Cir. 1979), cert. denied, 445 U.S. 915, 100 S.Ct. 1275, 63 L.Ed.2d 599 (1980).
 
 
 24
 The punitive nature of the remedy stems from the Board's characterization of the Company's offer to negotiate a new contract with the Union. It is not disputed that the Company notified the Union in 1978 that it intended to terminate the existing contract and wished to negotiate with the Union for purposes of reaching a new agreement. Nor is it disputed that the Union failed to respond to the Company's bargaining overture. While the full significance of this fact is stated below, it is important here to note that the Board dismissed the 1978 notice to renegotiate and condoned the Union's failure to respond by concluding that such an offer to bargain would have involved "an exercise in futility." 251 N.L.R.B. at 90, n.5.
 
 
 25
 It is true, as the Board notes, that, as a general rule, during negotiations, the employer is required by section 8(a)(5) of the Act, 29 U.S.C. § 158(a)(5) (1976), to maintain the status quo as to wages and working conditions even following the expiration date of the agreement. Peerless Roofing Co., Ltd. v. NLRB, 641 F.2d 734, 736 (9th Cir. 1981); Clear Pine Mouldings, Inc. v. NLRB, 632 F.2d 721, 729 (9th Cir. 1980), cert. denied, --- U.S. ----, 101 S.Ct. 2317, 68 L.Ed.2d 841 (1981). However, the expression of this rule has always recognized that such continuing liability of terms and conditions of an existing contract (which are mandatory subjects of bargaining) continues "until and unless (the employer) affords the Union an opportunity to bargain." Hinson v. NLRB, 428 F.2d 133, 139 (8th Cir. 1970). The Board itself recognizes this fact in its order when it states:
 
 
 26
 "Although an employer's contractual obligations cease with the expiration of the contract, those terms and conditions established by the contract and governing the employer-employee, as opposed to the employer-union, relationship survive the contract and present the employer with a continuing obligation to apply those terms and conditions, unless the employer gives timely notice of its intention to modify a condition of employment and the union fails to timely request bargaining, or impasse is reached during bargaining over the proposed change."
 
 
 27
 251 N.L.R.B. No. 17, at 90 (emphasis supplied). The rule simply acknowledges that an employer's obligations under a collective bargaining agreement continue until the employer fulfills its obligation to renegotiate a new contract. If impasse is reached after good faith bargaining, the employer is released from the terms of the terminated agreement.
 
 
 28
 In the instant petition, the Company was less than faithful to its obligations under the existing contract; however, the record indicates that without prejudice to its stance that no binding agreement existed, the Company properly notified the Union of its intention to terminate the existing contract and offered to negotiate a new one. The Board, by emphasizing the Company's prolonged transgressions under the terminated agreement, discounted the opportunity presented to the Union by the 1978 notice to negotiate, by declaring that "negotiations against a background of unremedied unfair labor practices would have been an exercise in futility." 251 N.L.R.B. at 90 n.5. The Board thus ignored its own statement of the law which holds that an employer's continuing obligations expire once the employer "gives timely notice of its intention to modify a condition of employment and the union fails to timely request bargaining." Id. By refusing to relieve the Company of its continuing obligations, which forms the justification for the continuing make whole remedy, the Board has punished the Company for its past conduct relative to the terminated agreement. There is nothing in the record to support any supposition that the Company would not negotiate a new contract in good faith or fail to perform under any new contract.
 
 
 29
 Bargaining for changes to the existing contract did not take place; the Company admits unilateral changes in terms and conditions of employment. However, the Board's focus upon long-standing noncompliance with the terminated contract as justification to excuse the Union from responding to the Company's bargaining offer in 1978 is punishment for the Company's past conduct. The employees and funds may be effectively made whole for the Company's 1976-1978 unfair labor practices with a remedy limited to the period of such practices, while a continuing remedy serves only to punish the Company for past conduct.
 
 
 30
 We note that our ruling here is in response to the circumstances of this case. Had the Company notified the Union of its intent to terminate, but refused to bargain for a new contract, under Fibreboard, continuing liability would be clear. Such is not the case here. We disagree with the Board's conclusion that the Union was not required to respond to the Company's offer to negotiate a new contract. To conclude that such offers amount to an invitation to a futile exercise because of past employer conduct is speculative, and to order an employer to suffer a continuing make whole remedy in the face of Union refusals to bargain cannot fairly be said "to effectuate the policies of the Act." Virginia Electric & Power Co. v. NLRB, 319 U.S. 533, 540, 63 S.Ct. 1214, 1218, 87 L.Ed. 1568 (1943).
 
 
 31
 Having affirmed the Board's findings of unfair labor practices in the first part of this opinion, we enforce the Board's remedial order as modified by limiting the make whole remedy to the period of the effective term of the Agreement, viz., June, 1976 to October 1, 1978. All other provisions of the Board's remedial order of August 13, 1980, shall be enforced.
 
 
 32
 The Board's order is ENFORCED as modified.
 
 
 
 [1]
 The record demonstrates that the only evidence of a card majority was the testimony of Union representative Moore, credited by the ALJ, that four employees in the relevant bargaining unit signed authorization cards immediately prior to the May 14, 1975 meeting. Since we do not disturb these credibility findings as discussed below, we consider the fact that the cards were signed as proven
 
 
 [2]
 The Board added a sixth member to the ALJ's finding of a five-member bargaining unit; however, the Board was still able to affirm that the four employees who had signed the Union authorization cards constituted a majority in the relevant employee bargaining unit
 
 
 [3]
 Section 8(f) provides, in relevant part:
 It shall not be an unfair labor practice under subsections (a) and (b) of this section for an employer engaged primarily in the building and construction industry to make an agreement covering employees engaged (or who, upon their employment, will be engaged) in the building and construction industry with a labor organization of which building and construction employees are members (not established, maintained, or assisted by any action defined in section 8(a) of this Act as an unfair labor practice) because (1) the majority status of such labor organization has not been established under the provisions of section 9 of this Act prior to the making of such agreement ....
 
 
 [4]
 See NLRB v. Local 103, International Association of Bridge, Structural & Ornamental Iron Workers, 434 U.S. 335, 98 S.Ct. 651, 54 L.Ed.2d 586 (1978) ("(§ 8(f) does not) expand the duty of an employer under § 8(a)(5), which is to bargain with a majority representative, to require the employer to bargain with a union with which he has executed a prehire agreement but which has failed to win majority support in the covered unit.") Id. 434 U.S. at 346, 98 S.Ct. at 658, 54 L.Ed.2d at 596. (emphasis in original)
 
 
 [5]
 The Company also argues that union majority status must be shown from jobsite to jobsite. The law in this area of § 8(f) pre-hire agreements is unsettled; see, e. g., NLRB v. Haberman Const. Co., 618 F.2d 288, 302 (5th Cir. 1980), modified in part on rehearing en banc, 641 F.2d 351 (5th Cir. 1981); however, we need not reach this issue because we affirm the Board's determination that the Company had a regular work force, of which a majority of the relevant employees had designated the Union as their bargaining representative
 
 
 [6]
 The Company also raises evidentiary issues with the ALJ's finding of a card majority when the actual authorization cards were not produced at the hearing. Secondary evidence is admissible to prove a fact which could have been proven with an original document when such document has been lost or destroyed, "unless the proponent lost or destroyed (the document) in bad faith." Fed.R.Evid. 1004(1). Section 10(b) of the Act, 29 U.S.C. § 160(b) (1976), provides that Board "proceeding(s) shall, so far as practicable, be conducted in accordance with the (Federal) rules of evidence...." Union representative Moore testified that he destroyed the cards a few days after signing the May 14, 1975 Agreement with Company partner Clark because he found them to no longer be of any value since he felt the signing of the Agreement was a recognition of the Union's majority status. With the above circumstances of the cards destruction elicited during the hearing, the ALJ made no finding that the cards were destroyed in bad faith
 
 
 [7]
 The Union argues that because the Company stipulated to the initial existence of a collective bargaining agreement in Auto, Marine and Specialty Painters v. Bay Area Sealers, 577 F.2d 609 (9th Cir. 1978), it should be collaterally estopped from denying its existence in the instant case. Since we have found that the Company is bound by Agreement for the reasons stated, we need not decide the collateral estoppel issue
 
 
 [8]
 The Company also argues that the continuing remedy would force the Company into substantive contract terms of an agreement that may be reached under different terms, citing NLRB v. George E. Light Boat Storage, Inc., 373 F.2d 762 (5th Cir. 1967). We need not meet this issue since we agree with the Company's other argument that the remedy is punitive