**STONE BOAT YARD, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, and United Brotherhood of Carpenters and Joiners of America, AFL–CIO, Respondent,**

**Carpenters Local Union No. 1149, Intervenor.**

**Nos. 82–7594, 82–7752.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 15, 1983.

Decided Sept. 6, 1983.

Herbert S. Matthews, South San Francisco, Cal., for petitioner.

Joseph Oertel, Washington, D.C., for respondent.

David A. Rosenfeld, San Francisco, Cal., for intervenor.

Before MERRILL, TANG, and NELSON, Circuit Judges.

TANG, Circuit Judge:

Stone Boat Yard (Stone) petitions this court for review of a decision and order issued by the National Labor Relations Board (Board). The Board found that Stone had engaged in an unfair labor practice by unilaterally ceasing to make payments to the union's health, welfare, and pension plans in violation of sections 8(a)(1) and (5) of the National Labor Relations Act (Act), 29 U.S.C. § 158(a)(1), (5). 264 N.L.R.B. 130 (1982). The Board filed a cross-application for enforcement of its order against Stone.

The question presented is whether Stone committed an unfair labor practice by making unilateral changes in an expired contract after union delay, but before bargaining impasse. The union delayed pending its negotiation of a master agreement that had always before served as the precursor to and the model for Stone's independent agreement with the union.

The Board concluded that Stone had made unlawful unilateral changes in the terms and conditions of the contract because it did not give the union detailed notice of the proposals before implementing them. The Board's decision is based on a reasonable interpretation of the Act. We therefore grant enforcement.

I

Background

The collective bargaining agreement of Stone Boat Yard, an independent shipbuilding company, with Local 1149 of the United

Brotherhood of Carpenters and Joiners was traditionally based on a master agreement negotiated between a multi-employer trade organization, the Pacific Coast Ship Builders Association, and the union.

Independent shipbuilders, such as Stone, have customarily waited until the master negotiations were completed, and they have then generally agreed to the terms of the master bargaining agreement. The most recent agreement between Stone and Local 1149 appears to be a modified version of the master agreement.

The present controversy grew from Stone's desire to negotiate and implement a new collective bargaining agreement before the completion of the master agreement. On April 15, 1980, the Carpenters' Council sent notice to all signatory employers, including independents, that the master agreement was to expire on June 30. Five weeks later, on May 21, Stone sent a one-sentence letter to Local 1149: "This notifies you ... that it is the intent of Stone Boat Yard, Inc. to offer substantial changes in the entire contract effective 1 July 1980." This letter was received by Local 1149's financial secretary and business agent, Ted Knudson, shortly before May 29, when negotiations on the master agreement were scheduled to begin in Portland.

Knudson appears to have been preoccupied with the daily negotiations in Portland until the last week in June, when the Council and the Association drafted a tentative master agreement. During this time, Stone President Richard Folker called several times for Knudson to initiate contract negotiations. Local 1149's receptionist told Folker that the union officials were unavailable because of the ongoing negotiations for a new master agreement.

In late June, while Knudson was still in Portland, Folker called an employee meeting and announced Stone's new health insurance program. On July 1, 1980, immediately after the expiration of the most recent collective bargaining agreement, Stone ceased payments to the union's health and welfare and pension funds. In place of those funds, Stone instituted a company-paid health insurance plan and proposed to implement a new retirement plan by January 1, 1981.

Local 1149 had no direct notice of Stone's changed fringe benefits until July 24, 1980, when Folker telephoned Knudson to say that Stone would not sign the master agreement. In either late July or early August, Knudson first learned that Stone had ceased payments to the union health and welfare and pension funds.

In mid-July the rank and file rejected the negotiated master agreement. Further negotiations ensued and on August 15 the new master agreement was ratified. Immediately thereafter, on August 21, Knudson sent a formal letter to Stone describing the new master agreement, stating that fringe benefits were due retroactive to July 1, and announcing the contract's availability upon its return from the printers. Representatives of Local 1149 and Stone subsequently met, but Stone did not sign the contract.

On January 5, 1981, Local 1149 filed an unfair labor practice charge with the Board. The union claimed that Stone's unilateral changes in health insurance and pension contributions constituted a refusal to bargain within the meaning of section 8(a)(1) and (5) of the Act. The administrative law judge (ALJ) hearing this case dismissed the union's charges, concluding that Stone's May 21 letter was sufficient notice of an intended change to excuse the company from its continuing obligations under the expired collective bargaining agreement.

On review, the Board reversed the findings of the ALJ. The Board held that Stone's one-sentence letter of May 21 gave no details as to contemplated changes and thus failed to excuse the company's continuing obligations under the old agreement. As a remedy, the Board ordered Stone to make payments to the union's health and welfare and pension funds. The payments were to be retroactive to July 1, 1980, and were not reduced to reflect payments Stone had made for its new company-sponsored health plan.

Stone challenges the Board's decision in three respects: (1) the company's unilateral changes were justified by the union's delay in bargaining; (2) the unfair labor charge is time barred; and (3) the remedial order is improper as a penalty or as tantamount to imposing a contractual settlement on one of the bargaining parties.

## II

### Unilateral Change in the Terms and Conditions of Employment

■ Section 8(a)(5) of the Act generally prohibits unilateral changes in the terms and conditions of employment reflected in an expired collective bargaining agreement. *NLRB v. Carilli,* 648 F.2d 1206, 1214–15 (9th Cir.1981). An employer is required to maintain the status quo until the parties negotiate a new agreement or bargain in good faith to impasse. *Id.* at 1214.

Stone does not deny that it made unilateral changes in the health care and pension terms of the expired contract. Instead, the company argues that the union's failure to respond to either its May 21 letter or its phone calls in late June constituted an attempt to avoid or delay bargaining. This attempt, Stone contends, justified the implementation of unilateral changes.

■ The Board, however, concluded that Stone was not excused from its continuing obligation to maintain the status quo because Stone had failed to give notice of specific proposed changes. We uphold the Board's conclusion unless it is arbitrary and capricious. *NLRB v. United Association of Journeymen and Apprentices,* 704 F.2d 1164, 1166 (9th Cir.1983). Furthermore, we will defer to the Board's interpretation of the scope of the bargaining obligation under section 8(d) of the Act if it is "reasonably defensible." *See Ford Motor Co. v. NLRB,* 441 U.S. 488, 497, 99 S.Ct. 1842, 1849, 60 L.Ed.2d 420 (1979). The fact that the Board disagreed with the ALJ has no effect where, as here, the disagreement does not turn on the credibility of witnesses. *Alfred M. Lewis, Inc. v. NLRB,* 587 F.2d 403, 409 n. 9 (9th Cir.1978).

■ The Board's requirement, that an employer give detailed notice of proposed changes before unilaterally implementing them, is a reasonable interpretation of the Act. In dismissing the one-sentence May 21 letter as inadequate, the Board correctly noted that other cases permitting unilateral changes have involved changes fully described to the union before their implementation. *See, e.g., M & M Building & Electrical Contractors, Inc.,* 262 N.L.R.B. 81 (1982).

We defer to the Board's decision here because it does not contradict the plain meaning of the Act, *see Allied Chemical & Alkali Workers v. Pittsburg Plate Glass Co.,* 404 U.S. 157, 166, 92 S.Ct. 383, 391, 30 L.Ed.2d 341 (1971), and does not appear to usurp major policy decisions properly made by Congress. *American Shipbuilding Co. v. NLRB,* 380 U.S. 300, 318, 85 S.Ct. 955, 967, 13 L.Ed.2d 855 (1965). In *Ford Motor Co.,* the Supreme Court required deference to a Board determination of what bargaining subjects were "terms or conditions of employment" within the meaning of the Act. 441 U.S. at 495, 99 S.Ct. at 1848. According to *Ford Motor Co.,* "Congress made a conscious decision to continue its delegation to the Board of the primary responsibility of marking out the scope of the statutory language and *of the statutory duty to bargain.*" *Id.* at 496, 99 S.Ct. at 1848 (emphasis added). *Ford Motor Co.* involved an interpretation of the Act that determined the subject matter of collective bargaining. The present case does not involve a textual interpretation, but defines the scope of the duty to bargain by defining part of the process that collective bargaining must follow. As such, it is entitled to substantial deference.

Requiring notice of specific proposals before allowing unilateral changes after an unwarranted delay in bargaining is consistent with our cases that require such notice before impasse and before the right can arise to implement unilateral changes. *E.g., Peerless Roofing Co. v. NLRB,* 641 F.2d 734, 735 (9th Cir.1981); *Clear Pine Mouldings v. NLRB,* 632 F.2d 721, 729 (9th

Cir.1980), *cert. denied,* 451 U.S. 984, 101 S.Ct. 2317, 68 L.Ed.2d 841 (1981).

An express notice requirement is also harmonious with the policy considerations on which the National Labor Relations Act is based. "The basic theme of the Act was that through collective bargaining the passions, arguments, and struggles of prior years would be channeled into constructive, open discussions leading, it was hoped, to mutual agreement." *H.K. Porter Co. v. NLRB,* 397 U.S. 99, 103, 90 S.Ct. 821, 823, 25 L.Ed.2d 146 (1970). Disclosure of proposed changes will facilitate open discussions by requiring employers to specify proposed changes in conditions of employment before implementing them unilaterally. Such disclosure will give the unions notice of exactly what might be lost if they waive the opportunity to bargain by continual and unwarranted delay.

We find it unnecessary to decide whether the union's dilatory conduct was unjustified under the circumstances of this case. Even if we assume that the delays were unwarranted, the Board properly concluded that the company implemented unilateral changes in terms and conditions of employment in violation of sections 8(a)(1) and (5) of the Act because the company failed to provide the union with notice of specific proposed changes.

### III

### Timeliness of the Unfair Labor Practice Charge

■ Section 10(b) of the Act, 29 U.S.C. § 160(b), provides that "no [unfair labor practice] complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the board and the service of a copy thereof upon the person against whom such charge is made . . . ." The limitation period does not begin to run until the party filing the charge knows or has reason to know that an unfair labor practice has occurred. *E.g., Peerless Roofing Co. v. NLRB,* 641 F.2d at 736; *NLRB v. California School of Professional Psychology,* 583 F.2d 1099, 1101–02 (9th Cir.1978).

■ We reject Stone's three arguments that the union had actual notice more than six months before January 5, 1981, the date on which Local 1149 filed its unfair labor practice charge. First, Stone contends that the union itself cancelled Stone's contractual obligation in April 1980 and that Stone's May 21 reply noted its desire to make substantial changes. This contention is unavailing. The union's April letter to all signatories of the master agreement merely announced the upcoming expiration of the agreement. It did not purport to cancel the employer's obligation of continued compliance with the expired agreement. Moreover, Stone's May 21 letter merely announced the company's desire to propose unspecified changes. The letter did not give notice of the unilateral implementation of such changes. It therefore gave no notice of the activity on which the union based its unfair labor practice charge.

Stone's second argument, that the action is time barred because its obligations to the union health and welfare and pension funds accrued outside the limitation period, also lacks merit. In *Peerless,* the court held that the mere accrual of employer liability for contributions did not constitute notice triggering the statute of limitations for an unfair labor practice charge based upon an employer's failure to contribute to union trust funds. 641 F.2d at 736.

Finally, Stone contends that notice of the unilateral changes given by the employer to the union members constituted notice to the union for purposes of triggering the statute of limitations. Nothing in the record suggests, however, that the union members were agents of the union. Therefore, knowledge possessed by the members will not be attributed to Local 1149. *See NLRB v. Belcor,* 652 F.2d 856, 860 (9th Cir.1981) (a union member may be considered an agent of the union if the union authorizes or condones the member's conduct). Thus, the union's unfair labor charge was timely.

### IV

### The Remedial Order

■ The Board's power to effectuate the policies of the Act and to restore the *status*

*quo ante* "is a broad discretionary one, subject to limited judicial review." *Fibreboard Paper Products Corp. v. NLRB,* 379 U.S. 203, 216, 85 S.Ct. 398, 406, 13 L.Ed.2d 233 (1964). We will enforce the Board's order if it is based on facts supported by substantial evidence, and on a reasonably defensible interpretation of the law that is consistent with the Act.

■ Stone raises two objections to that portion of the Board's "make-whole" remedy that required payment of past due contributions to the union's health and welfare and pension funds: (1) the order is punitive because it does not reflect employee loss and provides no offset for benefits provided through the employer-sponsored alternative plan; and (2) the remedy is tantamount to imposing a contractual term on one of the bargaining parties. Neither objection is meritorious.

Stone's first contention, that the order is punitive rather than remedial, conflicts with existing Ninth Circuit precedent. In *NLRB v. Carilli,* 648 F.2d 1206 (9th Cir. 1981), we held that an employer cannot complain of the extra cost of improperly created, substitute fringe benefits. *Id.* at 1217. The company is merely required to repay what it has unlawfully withheld. As in *Carilli,* it was the company that unlawfully chose to incur the additional expense of a private insurance program. Even if Stone's substitute fringe benefit program met the present needs of its employees, the diversion of contributions from the union funds undercut the ability of those funds to provide for future needs.

The company's second claim, that the remedy amounts to the imposition of a contract term, might have more force if the order referred to fringe benefit levels set in the new master agreement. However, the remedy requires back payment at the old level of fringe benefits, not at the level negotiated in the new 1981 master agreement. This claim is without merit.

We enforce the Board's order in its entirety.

PETITION FOR REVIEW DENIED; CROSS–APPLICATION FOR ENFORCEMENT GRANTED.