**ROZAY'S TRANSFER,**
Plaintiff–Appellee,

v.

**LOCAL FREIGHT DRIVERS, LOCAL 208, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN and HELPERS of AMERICA, Defendant–Appellant.**

No. 86–6544.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 5, 1988.

Decided June 24, 1988.

---

Transfer to execute a collective bargaining agreement. Following a bench trial, the district court found for Rozay's Transfer and granted its prayer for rescission of the collective bargaining agreement (agreement) and for indemnification for retroactive pension fund contributions under the agreement for which Rozay's Transfer was adjudged liable in a previous collection action brought by the pension trust fund. On appeal, the union contests not only the merits of the district court's finding of fraud, but also the district court's jurisdiction over this action and its authority simultaneously to award rescission and indemnification as a remedy. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.

I

The circumstances giving rise to this lawsuit were previously detailed in our decision in *Southwest Administrators, Inc. v. Rozay's Transfer, Inc.*, 791 F.2d 769 (9th Cir.1986) (*Southwest Administrators*), *cert. denied,* 107 S.Ct. 951, 93 L.Ed.2d 999 (1987), an action brought by the trust fund to collect retroactive pension fund contributions that Rozay's Transfer was obligated to make under its collective bargaining agreement with the union.

Prior to September 30, 1981, Rozay's Transfer, an employer in the trucking industry, and Teamsters Local 208 were parties to a collective bargaining agreement. Pursuant to the agreement, Rozay's Transfer made monthly contributions on behalf of its employees to the Western Conference of Teamsters Pension Fund. This trust fund is a multiemployer pension plan as defined by subsections 3(2) and (37)(A) of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1002(2), (37)(A).

After the agreement had expired, and while negotiations were continuing over the terms of a successor agreement, Rozay's Transfer continued to make contributions to the trust fund pursuant to the terms of the 1978–81 bargaining agreement. In July, 1982, when no successor agreement had yet been adopted, Ro-

Robert D. Vogel, Wohlner, Kaplon, Phillips, Vogel, Shelley & Young, Los Angeles, Cal., for defendant-appellant.

Stephen P. Pepe, O'Melveny & Myers, Los Angeles, Cal., for plaintiff-appellee.

Before WALLACE, TANG and NORRIS, Circuit Judges.

WALLACE, Circuit Judge:

Rozay's Transfer, an employer, brought this action against Teamsters Local 208 (union) for fraudulently inducing Rozay's

zay's Transfer informed the union that it had ceased making contributions to the pension fund.

In September, 1982, Local 208 filed an unfair labor practice claim with the National Labor Relations Board (NLRB) charging Rozay's Transfer under 29 U.S.C. § 158(a)(5) with refusal to execute a collective bargaining agreement that had allegedly been negotiated. The NLRB charge was subsequently amended to include the charge that Rozay's Transfer had unilaterally altered benefits and conditions of employment, including cessation of payments to the pension fund. Local 208 also filed a grievance alleging the cessation of contributions to the trust fund violated the collective bargaining agreement.

While the NLRB charge and the grievance were pending, William S. Rozay, the owner of Rozay's Transfer, and Archie Murrietta, president of Local 208, eventually reached a settlement. Under this settlement, employee wages would be reduced by $1.00 and Rozay's Transfer would resume payments to the trust fund on behalf of each employee at the approximate rate of $.99 per hour.

In light of the company's precarious financial position, Rozay expressed serious concerns about being required to make retroactive pension fund contributions for the period between May, 1982 and February, 1983. Murrietta, and Maurice E. Anderson, the director of the Western Conference of Teamsters, agreed to contact the trust fund and request a waiver of the obligation to make contributions for this period. Murrietta and Anderson assured Rozay that the delinquent payments would be forgiven, noting that the trust fund had waived the unpaid pension contributions of other employees under similar circumstances.

Murrietta wrote to the trust fund on behalf of Rozay's Transfer requesting relief from payment of contributions for this interim period. However, on February 16, 1983, the trustees of the Western Conference of Teamsters Pension Fund, voted to deny the request to forgive the unpaid contributions.

When the new collective bargaining agreement was executed on March 8, 1983, Murrietta had been informed of the trust fund's decision to deny a waiver of the delinquent contributions. He did not advise Rozay of this action. Rozay, assuming that unpaid contributions would be forgiven, signed the agreement, which covered the period from September 1, 1981 to September 30, 1984. The parties also executed a settlement agreement resolving the NLRB unfair practice complaint and the breach of agreement grievance. Local 208 thereafter withdrew the NLRB unfair labor practice charge and the grievance.

Subsequently, Southwest Administrators, Inc., the assignee of the Western Conference of Teamsters Pension Fund, filed this action against Rozay's Transfer under sections 502(a) and 515 of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1132(a), 1145, to collect delinquent contributions for the period between May, 1982 and February, 1983.

Rozay's Transfer contended that its obligation to make pension fund contributions dated only from March 8, 1983, when the collective bargaining agreement was signed. Rozay's Transfer also filed a counterclaim seeking the return of $57,235.28 in contributions made to the trust between October, 1981 and April, 1982, the period between expiration of the old bargaining agreement and the date Rozay's Transfer ceased making payments.

791 F.2d at 771–72 (footnote omitted).

Following a bench trial, the district court in *Southwest Administrators* found that Rozay's Transfer had been "fraudulently induced" by Murrietta into signing the agreement and that there had been no "meeting of the minds" on the retroactive pension fund contributions. *Id.* at 772. Nonetheless, the district court concluded that the union's oral misrepresentation was not a defense to the trust fund's right to collect the contributions required by the express terms of the agreement. *Id.* Con-

sequently, the district court entered judgment for Southwest Administrators for $76,133.29 in retroactive pension fund contributions, $15,226.25 in liquidated damages, $25,039.09 in interest, and $6,390.00 in attorneys' fees. *Id.*

On appeal, we affirmed. Relying on *Southern California Retail Clerks Union and Food Employers Joint Pension Trust Fund v. Bjorklund,* 728 F.2d 1262 (9th Cir.1984), we held that while a union's misrepresentation that amounted to fraud in the execution could constitute a defense to a trust fund's subsequent collection action, a misrepresentation that amounted only to fraud in the inducement could not. *Id.* at 774. Concluding that the misrepresentation by the union went only to induce Rozay's Transfer to enter into the agreement, we held that the agreement was not "void," but merely "voidable" as against the trust fund. *Id.* at 775. Hence, we concluded that, regardless of the union's fraudulent inducement, Rozay's Transfer was still obligated to make the contributions to the pension trust fund required by the express terms of the agreement. *Id.*

Subsequent to the entry of judgment by the district court in the collection action brought by the trust fund, but prior to our decision in *Southwest Administrators,* Rozay's Transfer initiated a separate action against the union under section 301 of the Labor Management Relations Act (LMRA), 29 U.S.C. § 185(a), for fraudulent inducement. After a bench trial, the district court concluded that the union was guilty of fraudulent misrepresentation in procuring the apparent assent of Rozay's Transfer to the March 8, 1983, agreement, and entered judgment in favor of Rozay's Transfer. In fashioning a "make whole" remedy, the district court (1) rescinded the March 8, 1983, agreement, (2) awarded Rozay's Transfer indemnification from the union for contributions owed to the trust fund as a result of the union's fraudulent misrepresentation, and (3) awarded Rozay's Transfer indemnification from the union for attorneys' fees and costs incurred by Rozay's Transfer in defending the *Southwest Administrators* litigation both at trial and on appeal. The union timely appealed.

On appeal, the union challenges virtually all the factual findings and legal conclusions underlying the district court's determination that the union is liable for fraudulent misrepresentation. Regarding the remedy awarded, the union challenges the district court's award of rescission and indemnification for contributions owed to the trust fund on both statutory and equitable grounds, and contests the propriety of awarding indemnification for the attorneys' fees and costs that Rozay's Transfer incurred in defending the *Southwest Administrators* lawsuit. We granted leave to the Southern California District Council of Laborers and International Union of Operating Engineers, Local Union No. 12, AFL–CIO (union's amicus) to file an amicus brief on behalf of the union and to the Merchants and Manufacturers Association and the California Trucking Association (Rozay's Transfer's amicus) to file an amicus brief on behalf of Rozay's Transfer. In its amicus brief, the union's amicus objects to the district court's jurisdiction to hear this case.

## II

■ Rozay's Transfer brought its action pursuant to section 301 of the LMRA which provides for district court jurisdiction over suits involving collective bargaining agreements. The union's amicus, however, contends that because the union's conduct in this case was arguably an unfair labor practice, the NLRB had exclusive primary jurisdiction over the claims of Rozay's Transfer.

The union's amicus correctly interprets *San Diego Building Trades Council v. Garmon,* 359 U.S. 236, 245, 79 S.Ct. 773, 779, 3 L.Ed.2d 775 (1959), as conferring exclusive primary jurisdiction on the NLRB over cases involving conduct that is arguably an unfair labor practice under section 8 of the National Labor Relations Act (NLRA), 29 U.S.C. § 158. Because the union's nondisclosure is arguably an unfair labor practice, insofar as it constituted a failure to bargain in good faith, the amicus reasons that the district court was deprived

of jurisdiction by the *Garmon* preemption doctrine.

■ Although no one disputes that the union's conduct was arguably an unfair labor practice, the argument of amicus is incorrect as a matter of law. LMRA § 301 carves out a broad exception to the NLRB's primary jurisdiction for claims arising out of collective bargaining agreements, whether or not such claims would also be an unfair labor practice under section 8 of the NLRA. In cases involving conduct that is both an unfair labor practice and a violation of a collective bargaining agreement, the NLRB and the district courts have concurrent jurisdiction. *See William E. Arnold Co. v. Carpenters District Council of Jacksonville,* 417 U.S. 12, 15–16, 94 S.Ct. 2069, 2071–72, 40 L.Ed.2d 620 (1974). Section 301, moreover, applies not only to suits for breach of a collective bargaining agreement once it is duly formed, but also to suits impugning the existence and validity of a labor agreement, *International Brotherhood of Electrical Workers, Local 532 v. Brink Construction Co.,* 825 F.2d 207, 212 (9th Cir. 1987); *John S. Griffith Construction Co. v. United Brotherhood of Carpenters and Joiners,* 785 F.2d 706, 712 (9th Cir.1986) (in suit under LMRA § 301, district court has jurisdiction to determine the existence of a labor contract), including those alleging improper conduct or mistake during the formation of the agreement. *See, e.g., Operating Engineers Pension Trust v. Gilliam,* 737 F.2d 1501, 1503–05 (9th Cir.1984) (fraud); *H. Prang Trucking Co. v. Local Union No. 469,* 613 F.2d 1235, 1238–39 (3d Cir.1980) (mutual mistake of fact). Thus, we hold that the district court had jurisdiction under LMRA § 301 to entertain this action alleging fraudulent inducement in the formation of the agreement.

### III

Unlike its amicus, the union does not dispute the district court's jurisdiction under section 301. Rather, the union contests the district court's legal determination that Rozay's Transfer was fraudulently induced by Murrietta's oral misrepresentation into signing the agreement. In addition, the union maintains that even if the district court's finding of fraud were correct, the relief that it awarded was improper. We now address the liability issues, dealing first with the challenge to factual findings and then to the conclusions of law.

### A.

To establish a claim of fraudulent misrepresentation, Rozay's Transfer must prove that the union knowingly made a false representation concerning a material fact with the specific intent to deceive Rozay's Transfer and that Rozay's Transfer detrimentally relied upon the false representation. *See Pence v. United States,* 316 U.S. 332, 338, 62 S.Ct. 1080, 1083, 86 L.Ed. 1510 (1942); *Hart v. McLucas,* 535 F.2d 516, 519 (9th Cir.1976). On the merits, the union challenges the district court's findings on each of these elements of fraudulent concealment, contending that the district court (1) erred in finding that the union committed a fraudulent misrepresentation with the specific intent to deceive Rozay's Transfer into signing the agreement, (2) erred in concluding that the alleged misrepresentation concerned a material fact, (3) erred in finding that Rozay's Transfer had detrimentally relied upon the fraudulent misrepresentation, (4) erred as a matter of law in concluding that Rozay's Transfer's reliance on Murrietta's representations was reasonable, and (5) erred as a matter of law in concluding that Rozay's Transfer would not have been contractually obligated to pay the delinquent pension contributions even had it not signed the agreement.

We review the district court's findings of fact, whether based on oral or documentary evidence, under the clearly erroneous standard, Fed.R.Civ.P. 52(a); *Cooling Systems and Flexibles, Inc. v. Stuart Radiator, Inc.,* 777 F.2d 485, 487 (9th Cir.1985), while we review its conclusions of law de novo. *United States v. McConney,* 728 F.2d 1195, 1201 (9th Cir.) (en banc) (*McConney*), *cert. denied,* 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984). Moreover, we will not disturb the district court's interpretation of

a contract that looks to extrinsic evidence of what the parties said and did unless it is clearly erroneous. *Miller v. Safeco Title Insurance Co.,* 758 F.2d 364, 367 (9th Cir. 1985).

The district court's findings that Murrietta had the specific intent to induce Rozay's Transfer into signing the agreement and that Rozay's Transfer detrimentally relied on his misrepresentation are findings of historical fact that are reviewed for clear error. *See* Fed.R.Civ.P. 52(a); *McConney,* 728 F.2d at 1200. Particular deference is paid to the district court's credibility findings. *Anderson v. City of Bessemer City,* 470 U.S. 564, 579–80, 105 S.Ct. 1504, 1514, 84 L.Ed.2d 518 (1985).

### B.

█ Notwithstanding the union's protestations to the contrary, there was ample evidence to support the district court's factual findings essential to its determination of fraud. The district court obviously found the testimony presented by Rozay's Transfer more credible than Murrietta's, and with good reason. There was ample testimony by the executives of Rozay's Transfer, and corroborating letters from Rozay's Transfer to the union, to show that the whole point of the settlement agreement was to afford Rozay's Transfer economic relief and that absent a waiver of the $76,133.29 in unpaid retroactive pension fund contributions, there would be no significant economic relief. Correspondence between Rozay's Transfer and the union reveals that the Rozay's Transfer trucking business had fallen on hard times, that it was operating in the red, and that to bring down costs to the point where it could begin operating profitably again, it had to decrease its employees' total compensation package. During its renegotiation of the agreement that expired on September 30, 1981, Rozay's Transfer consistently maintained that it could no longer afford to provide its employees with the same package of wages and benefits. Indeed, while the disputed agreement of March 8, 1983, provided that Rozay's Transfer would resume pension fund contributions in the future at the approximate rate of $0.99 per hour, the side agreement offset the cost of such contributions by across the board wage reductions of $1.00 per hour and a waiver of five days' sick leave and two paid holidays.

More importantly, however, the trial evidence is entirely consistent with the district court's finding that Rozay's Transfer would not have signed the agreement if Rozay's Transfer had been aware that the agreement required it to pay retroactive pension fund contributions for the period between May 1982 and February 1983. The parties stipulated that on January 17, 1983, William Rozay (Rozay), President of Rozay's Transfer, met with Anderson and Murrietta to resolve a pending labor dispute between Rozay's Transfer and the union relating to the unilateral cessation of pension fund contributions by Rozay's Transfer for the period from May 1982 through February 1983. At this meeting, Anderson represented to Rozay that the trust fund had in the past forgiven other employers' unpaid pension fund contributions. Anderson told Rozay that he would see to it that the trust fund similarly forgive delinquent contributions of Rozay's Transfer for the period in question. During this same meeting, Murrietta told Rozay that he would write a letter to the trust fund on behalf of Rozay's Transfer requesting that the trust fund forgive the delinquent payments.

Sometime after this meeting, Rozay called Anderson and was assured that Anderson was doing "all that was necessary" to relieve Rozay's Transfer of any pension fund obligations for the period in question. On January 21, 1983, Rozay wrote a letter to Murrietta in which Rozay confirmed his understanding that "[n]o pension contributions will be required for the period April 1, 1982 through January, 1983." On January 26, 1983, Murrietta replied to Rozay's letter and also wrote to the trust fund requesting that it forgive the unpaid pension fund contributions of Rozay's Transfer.

Subsequently, around March 4, 1983, Michael Uranga, an employee of the trust

fund's administrators, informed Murrietta at a social function that the trust fund trustees had voted against forgiving the unpaid contributions of Rozay's Transfer. When Murrietta met again with Rozay on March 8, 1983, for the purpose of executing a new agreement between Rozay's Transfer and the union, Murrietta did not tell Rozay that the trust fund had already rendered an adverse decision on his request to forgive the unpaid contributions. Given this evidence, it was not clear error for the district court to infer that Rozay would not have signed the existing agreement knowing that it would be bound to make over $76,000 in retroactive pension fund contributions and that Murrietta concealed the trust fund's decision not to forgive the delinquent contributions because he realized that Rozay would not sign the contract if he knew of the decision. Hence, the district court's findings on specific intent and materiality are not clearly erroneous.

The union contends that the failure of Rozay's Transfer to seek to reopen negotiations with Murrietta or to rescind, reform, or amend the agreement after receiving the trust fund's letter dated March 24, 1983, denying his request to forgive delinquent contributions, proves that Rozay did not in fact detrimentally rely on Murrietta's misrepresentation, but, rather, indicates that Rozay's Transfer was satisfied with the bargain. It was not until the deposition of Uranga on April 30, 1984, however, when the contract had nearly expired, that Rozay's Transfer first learned of Murrietta's fraud, and it was not until March 12, 1985, during the *Southwest Administrators* trial and after the contract had expired, that Murrietta finally confessed to his concealment.

Moreover, the union's argument ignores the fact that during the dispute between Rozay's Transfer and the trust fund, Rozay's Transfer had initially maintained that Rozay and Murrietta had orally modified the provisions of the March 8, 1983, agreement relating to the retroactive contributions for the period in question. When Rozay's Transfer finally learned of Murrietta's fraud, it promptly interposed a contractual defense of fraudulent misrepresen-

tation. These facts belie the union's contention that Rozay's Transfer was satisfied with the agreement even though it obligated Rozay's Transfer to make retroactive pension fund contributions. Rozay's Transfer never acquiesced to an agreement that required such payments. In view of this evidence, the district court could have properly concluded that Rozay's Transfer had in fact believed that Rozay and Murrietta had orally modified the express terms of the March 8, 1983, agreement, that the union would be able to use its influence to procure forgiveness of delinquent contributions, and that there was no basis for attacking its failure to do so until Rozay's Transfer learned of the fraud years later. It was therefore not clearly erroneous for the district court to find that Rozay had in fact relied detrimentally on Murrietta's misrepresentation despite the apparent inaction of Rozay's Transfer.

C.

In addition to attacking the district court's factual findings, the union also challenges its legal conclusions relating to the ingredients of fraudulent misrepresentation. In this appeal, the union does not contest that Murrietta's intentional failure to disclose the trust fund's adverse decision could constitute a fraudulent misrepresentation, and, therefore, we do not reach the question of whether a party has a duty to disclose material facts to another party during collective bargaining negotiations or whether a breach of such a duty will necessarily constitute actionable fraud.

1.

■ The union first contends that Rozay's reliance on Murrietta's misrepresentation was unreasonable as a matter of law. Obviously, as a question of law, we review this issue de novo. *See McConney*, 728 F.2d at 1201. Because the trust fund was not forbidden by law from forgiving delinquent contributions, we do not believe that an employer can never reasonably rely on a union's representations that it can influence favorable discretionary acts by

the pension administrators. Because there was a commonality of interest between the union and the trust fund to further the welfare of the employees, it was not unreasonable as a matter of law for Rozay's Transfer to believe that the union could favorably influence the trust fund.

The substance of the union's argument is that it is unreasonable as a matter of law for an employer to rely on a union's representations regarding its ability to influence a trust fund, because a union cannot bind a trust fund, nor does it have a legal duty to disclose to an employer any information concerning the employer's obligations to a trust fund. The cases that it cites for this broad proposition, however, do not address the question presented here—whether an employer may sue a *union* for its intentional misrepresentation of an existing material fact. *Chamberlin v. Bakery & Confectionery Union & Industry International Pension Fund*, 99 L.R.R.M. 3176, 3177–80 (N.D.Cal.1977), for example, involved a suit by a retired employee seeking to estop a *trust fund* from denying him benefits based upon a union representative's erroneous representation that he was eligible for such benefits. Because the trust had not made any misrepresentations, the union representative lacked apparent authority to bind the fund, and the terms of the collective bargaining agreement rendered the employee ineligible for benefits, the district court determined that the employee had not reasonably relied on a representation of the defendant, and denied relief. In the present case, in contrast, Rozay's Transfer bases its claim for relief against the *union* on the *union's* intentional failure to apprise it of the existence of a material fact: the trust fund's adverse decision. *Chamberlin,* which involves a suit against a *trust fund* based upon misrepresentations of a union representative, is thus inapplicable to the question of Rozay's reasonable reliance in this case. *See also Pension Trust v. Moine Brothers Excavators,* 124 L.R.R.M. 2030 (C.D.Cal.1986) [available on WESTLAW, 1986 WL 15442] (trust fund not bound by union representative's misrepresentations).

In *Lucky Construction Co. v. Operating Engineers Local 12,* 4 E.B.C. 2521 (S.D.Cal.1983), the district court held that an employer could not recover benefits paid to a trust fund from a union based upon a union agent's alleged verbal representation regarding the employer's obligations to the trust fund. The court determined that Lucky's reliance on the union's representation was unreasonable as a matter of law because it was charged with knowledge of its legal and contractual obligations set forth in the Master Labor Agreement and the trust agreements to which it was bound. Because the union had no power to modify these agreements, and because the union owed no duty to explain to Lucky its legal obligations under the agreements, the union could not be liable for its negligent misrepresentations concerning Lucky's *legal* obligations under the agreements. *Id.* at 2523.

*Lucky* stands for the familiar proposition that an employer cannot reasonably rely on a union's erroneous representation regarding the scope of the *legal* obligations to a distinct entity of which the employer is presumably aware. This rule is inapplicable here. In the present case, Rozay's Transfer alleges that the union intentionally misrepresented a material *fact* by failing to disclose that its obligation to the trust fund would not be forgiven. Rozay's Transfer did not miscomprehend its legal obligations to the fund, rather, it misunderstood the state of facts, known to the union, existing at the time it entered into a separate agreement with the union. *Lucky* does not control this issue before us.

Similarly, in *Operating Engineers Pension Trust v. Cecil Backhoe Service, Inc.,* 795 F.2d 1501, 1507–08 (9th Cir.1986), we held that a union owed an employer no duty to disclose that he was legally bound by a short form collective bargaining agreement that incorporated the terms of a master labor agreement requiring the employer to make contributions to an employee pension fund. *Cecil Backhoe,* like *Lucky,* however, is clearly distinguishable from the instant case. The union in that case had not led the employer to believe that its legal obligations would be anything

other than those set forth in the written agreement, nor had the union intentionally concealed a material *fact. Id.* at 1508. Here, by contrast, Rozay's Transfer was affirmatively led to believe that the union would be able to exert its influence to see to it that its delinquent contributions were forgiven. In the present case, moreover, the information that the union failed to disclose did not pertain to *legal* consequences, which the employer is presumed to understand. *See id.* at 1508 (the union committed no "wrong" by failing to disclose that the agreements applied to Cecil Backhoe's employees). Rather, the information pertained to a material *fact*, namely, that the trust fund had already refused to exercise its discretion to forgive the delinquent payments.

Here, we are bound by the district court's factual finding that at the time the parties signed the March 8, 1983, agreement, "there was no meeting of the minds between Rozay's and Local 208 on the issue of retroactive pension contributions." Further, we are bound by the district court's determination that "[t]he Trustees' decision on February 16, 1983, not to grant Rozay's relief from paying the retroactive pension contributions changed the essential character and nature of the agreement which Rozay's and Local 208 reached on January 17, 1983, and which agreement Mr. Rozay believed he was executing on March 8, 1983." Reviewed in the light of all the evidence that Rozay signed the agreement only because he believed that he was securing economic relief for his company, mainly through avoidance of the retroactive pension fund contributions for the period in question, we cannot say that these findings by the district court were clearly erroneous. Consequently, there having been no "meeting of the minds" between the parties on the issue of retroactive pension fund contributions, regardless of the apparent plain language of the agreement, it was not unreasonable as a matter of law for Rozay to rely on Murrietta's fraudulent misrepresentation prior to signing the March 8, 1983, agreement.

While the union has cited no authority for the proposition that a union cannot be held liable to an employer for intentionally misrepresenting facts relevant to the employer's pension fund obligations during the collective bargaining process, neither Rozay's Transfer nor its amicus have alerted us to any direct authority recognizing such liability on the part of the union. Rozay's Transfer's amicus, however, argues that because pension plans are a mandatory subject of bargaining and the employer must negotiate in good faith only through the union's chosen representative, it is untenable to hold that the union cannot be held liable for intentional misrepresentations regarding material facts relating to the employer's pension obligations. We find this argument persuasive.

First, as Rozay's Transfer's amicus correctly observes, the trustees are not collective bargaining agents and hence cannot negotiate pension fund provisions. *See NLRB v. Amax Coal Co.*, 453 U.S. 322, 334, 101 S.Ct. 2789, 2796, 69 L.Ed.2d 672 (1981). Second, as the Seventh Circuit pointed out in *Battle v. Clark Equipment Co.*, 579 F.2d 1338, 1349 (7th Cir.1978), *overruled on other grounds, Rupe v. Spector Freight Systems, Inc.*, 679 F.2d 685, 690 n. 3 (7th Cir.1982), an "employer cannot be held liable for ... retroactive monetary relief when it relies in good faith on union actions or representations that are not obviously outside the scope of its authority." In that case, the employer had relied on the union's representations that its members had ratified certain amendments pursuant to properly conducted internal union procedures. *Id.* Although the present case involves the union's representations concerning its authority to induce the trust fund to forgive delinquent pension contributions, rather than internal union procedures, we do not believe that the union's ability to influence a discretionary act of the trust fund was "obviously outside the scope of its authority."

Finally, the union has cited no authority or sound legal principle, nor can we discern any, explaining why rules pertaining to fraudulent inducement should not apply to the formation of labor contracts. Hence,

we do not find it unreasonable as a matter of law for Rozay's Transfer to have relied on the union's assurances that it could convince the trust fund to act favorably on the petition of Rozay's Transfer.

### 2.

■ Next, the union argues that because Rozay's Transfer would have been obligated to make the pension contributions even had it not signed the agreement, Murrietta's misrepresentation could not have been "material" to Rozay's decision to sign the agreement. We interpret this materiality contention as a "causation" argument. The union is really arguing that if Rozay's Transfer were legally obligated to make the retroactive contributions whether or not Rozay signed the March 8, 1983, agreement, then Murrietta's misrepresentation could not have been the cause-in-fact of the injury to Rozay's Transfer. Causation is ordinarily a question of fact that is reviewed for clear error. *See Armstrong v. United States,* 756 F.2d 1407, 1409 (9th Cir.1985). But whether or not there was a prior legal obligation to make such payments absent a valid, signed collective bargaining agreement is a mixed question of fact and law that requires us to assess whether legal duties arise under a given set of facts. Accordingly, we review this issue de novo. *See McConney,* 728 F.2d at 1201–02.

The union marshals two main arguments in support of its contention that Rozay's Transfer would have been obligated to make the payments even had it refused to sign the March 8, 1983, agreement. Initially, the union argues that as of November 1981, "[t]he undisputed material facts in this case disclose" that the parties had reached a mutual agreement on a new contract and that the refusal by Rozay's Transfer to sign it did not prevent the agreement from going into effect. We find no merit in this claim. The record discloses neither a stipulation by Rozay's Transfer, nor a finding by the district court that a binding agreement was reached in November of 1981. On the contrary, the record reveals that while the parties had reached a tentative agreement on the terms of a successor agreement, which the union was to incorporate into a written draft, Rozay's Transfer did not receive a draft until April 18, 1982. On May 6, 1982, Rozay's Transfer returned to the union the draft unsigned to make certain corrections, but the union never responded. Because Rozay's Transfer had experienced severe financial problems during the interim, on this same day it informed the union that a reduction in labor costs, including termination of pension benefits, was required if Rozay's Transfer were to remain in business. Indeed, on both June 11, 1982, and June 28, 1982, Rozay's Transfer sent certified letters to the union proposing, among other things, cessation of pension contributions. On neither occasion did the union respond. In view of the union's inaction, the failure of the parties formally to execute the tentative November 1981 agreement, and the clearly expressed intent of Rozay's Transfer to modify this agreement in light of changed circumstances, we fail to see how a binding agreement came into effect as of November 1981.

In presenting its first causation argument, the union reads our prior decision in *Southwest Administrators* as holding that Rozay's Transfer was still contractually obligated to pay the delinquent contributions even if the March 8, 1983, labor contract were rescinded for fraud. However, while we recognized in *Southwest Administrators* that Murrietta's fraud did not render the agreement void as to the obligations of Rozay's Transfer to the trust fund, 791 F.2d at 774–75, this holding has no bearing on the question of causation in this action. Just because Rozay's Transfer is contractually obligated to the trust fund does not answer the question whether the union caused Rozay's Transfer to assume this obligation. We did not suggest in *Southwest Administrators* that Rozay's Transfer could not seek redress against the union in a separate action. Indeed, we suggested that the proper remedy for Rozay's Transfer might lie in an action for indemnification against the union. *See id.* at 777 n. 4.

In the second branch of its "causation" argument, the union maintains that even if the parties had not negotiated any new labor agreement after the old one had expired in September 1981, Rozay's Transfer would nonetheless have remained statutorily obligated under the NLRA to continue paying into the pension fund throughout the period in question. The union relies on *NLRB v. Carilli*, 648 F.2d 1206, 1213–14 (9th Cir.1981), which held that until the parties negotiate a new agreement or bargain in good faith to impasse, the employer is required to maintain the status quo under the expired collective bargaining and trust agreements, including payments to pension trusts. *Accord Southwest Administrators*, 791 F.2d at 776. Rozay's Transfer, however, does not interpret our decision in *Carilli* as imposing a general obligation on the employer to maintain the terms of an expired collective bargaining agreement pending renegotiation. Instead, it reads *Carilli* as holding only that an employer *may* continue to contribute to a pension trust fund following expiration of a collective bargaining agreement without violating section 302(c)(5) of the LMRA, which forbids such payments in the absence of an express, written agreement. Just because an employer *may* continue contributing to a pension trust fund following the expiration of a collective bargaining agreement, Rozay's Transfer argues, does not mean that a trust fund has the *right* to sue to collect such contributions during this period.

■■■ After giving this argument careful consideration, we reject such a narrow interpretation of our holdings in *Carilli* and *Southwest Administrators*. Our cases have long established that upon expiration of a collective bargaining agreement, an employer has a duty to continue the status quo until the parties bargain to impasse or reach a new agreement. *Southwest Administrators*, 791 F.2d at 776–77. By unilaterally changing the status quo before that time, the employer commits an unfair labor practice in violation of NLRA § 8(a)(5) (failure to bargain in good faith). *See, e.g., Laborers Health & Welfare Trust v. Advanced Lightweight Concrete,*

779 F.2d 497, 500 (9th Cir.1985) (*Advanced Lightweight*), aff'd, —— U.S. ——, 108 S.Ct. 830, 98 L.Ed.2d 936 (1988). This obligation to maintain the status quo under the expired labor agreement applies with equal force to the obligation to continue contributing to a pension trust fund. *Southwest Administrators*, 791 F.2d at 776–77; *Peerless Roofing Co. Ltd. v. NLRB*, 641 F.2d 734, 736 (9th Cir.1981).

Further, this obligation to continue making pension fund contributions is legally enforceable. While the Supreme Court just recently held that the district courts do not have jurisdiction under ERISA over a suit brought by a pension trust fund to recover delinquent contributions due after expiration of a collective bargaining agreement, it also recognized that a pension trust fund could seek to enforce this obligation by filing an unfair labor practice charge before the NLRB. *See Advanced Lightweight*, 108 S.Ct. at 837–38; *see also Advanced Lightweight*, 779 F.2d at 500–02.

That section 8(a)(5) creates an enforceable obligation on the part of an employer to continue pension fund contributions pending renegotiation of an expired collective bargaining agreement belies the claim of Rozay's Transfer that an employer is permitted, but cannot be required by the trust fund, to make such contributions during this hiatus. Rozay's Transfer did not allege, nor did the district court find, that the parties had bargained to impasse. Given this interpretation, we turn to the question of whether Rozay's Transfer would have been obligated to make the contributions "but for" Murrietta's misrepresentations.

■■■ One might read our prior decision in *Southwest Administrators* as suggesting that Rozay's Transfer had an independent legal obligation to make the payments. *See* 791 F.2d at 776–77. Nonetheless, we remain unpersuaded by the union's argument that notwithstanding Murrietta's alleged misrepresentation, Rozay's Transfer would still have been legally obligated to make the pension fund contributions for the period in question. During oral argu-

ment, Rozay's Transfer suggested the basis of our reasoning. The gravamen of its contention is that, even assuming that it would otherwise have been obligated to make the retroactive contributions while awaiting negotiation of a new labor agreement, the parties in fact reached a new agreement on January 17, 1983, extinguishing any incipient obligation to make retroactive contributions. We find this argument convincing. For even if we were to find that Rozay's Transfer were legally obligated under the NLRA to continue the pension contributions all along, the union was free to bargain away such a right through the collective bargaining process. *See American Distributing Co. v. NLRB,* 715 F.2d 446, 449–50 (9th Cir.1983) (*American*), *citing NLRB v. C & C Plywood Corp.,* 385 U.S. 421, 430–31, 87 S.Ct. 559, 565, 17 L.Ed.2d 486 (1967). The employer's obligation to maintain the status quo is therefore merely presumptive in the sense that it can be discharged through the bargaining process. Waivers of a union's right under the NLRA can occur "by express contractual provisions, by bargaining history, or by a combination of the two." *American,* 715 F.2d at 450. Thus, it is not true as a matter of law that absent Murrietta's fraud, Rozay's Transfer would still have remained liable for pension fund obligations under the expired labor contract. The parties by express provision in a new agreement could always have extinguished this obligation. We see no reason why this could not be done retroactively. *See Advanced Lightweight,* 108 S.Ct. at 838 ("the employer and the union may enter into a settlement that either reduces, or even might waive, the employer's post-contract obligations to contribute to the pension fund").

Moreover, that the parties would have agreed to such terms is not sheer conjecture at this stage. We observe that the contract as executed did not contain such a term, apparently because "the parties believed it was not possible simply to draft a collective bargaining agreement providing for prospective-only payment of contributions to the pension fund." *Southwest Administrators,* 791 F.2d at 771 n. 1. The

union may have been constrained in its bargaining because "[i]t was the established policy of the Western Conference of Teamsters Pension Trust Fund not to accept contributions made under any collective bargaining agreement which provided for a 'gap' in contributions. Thus, when a collective bargaining agreement expired, in order for the employer to be reinstated in the trust fund, the new agreement had to provide for the payment of contributions for the interim between the two agreements." *Id.* at 771–72 n. 1. Even so, union officials clearly evinced by their words and actions their intent to free Rozay's Transfer from the burden of making retroactive pension fund contributions for the period in question. Indeed, the district court found that on January 17, 1983, Rozay's Transfer and the union agreed to "the resumption of the payment of pension contributions *prospectively.*" (Emphasis added.) Although at this time, the district court did not find that the parties agreed specifically to a waiver of *retroactive* pension fund obligations, it found that Anderson represented to Rozay that the trust fund had forgiven unpaid pension contributions of other employers in the past and that he would ask the trust fund likewise to waive the unpaid contributions for the period from May 1982 to February 1983. Further, the district court found that four days later, on January 21, 1983, Rozay sent Murrietta a letter confirming the terms of the January 17, 1983, agreement, in which Rozay articulated his understanding that, under the new agreement, retroactive contributions would not be required. In his reply to this letter, Murrietta did not express any disagreement or objection to Rozay's understanding that there would be no retroactive pension contributions. Hence, we agree with the district court that Murrietta's fraud deprived Rozay's Transfer of the opportunity to negotiate away any continuing legal obligation to make the retroactive payments—a result that was clearly intended by the parties' words and course of conduct during the negotiations that culminated in the January 17, 1983, settlement agreement.

We recognize that despite the union's desire to relieve the obligation of Rozay's Transfer to make the retroactive payments, the union may have believed that it could not include such a term in the new agreement, because of the trust fund's policy against allowing gaps in coverage. Had the parties reached impasse, or had the union agreed retroactively to abolish the delinquent contributions to the trust fund, the trust fund's exclusive remedy, if any, would have been to file an unfair labor practice charge under the NLRA to compel payment of the delinquent contributions. The district court found that the direct consequence of Murrietta's fraud was to induce Rozay's Transfer to sign an agreement that provided for the payment of these delinquent contributions to the trust fund. Without this agreement, the trust fund would not have been able to pursue its prior action under section 515 of ERISA, 29 U.S.C. § 1145, to collect these contributions, for an action under section 515 is available only to collect "promised contributions." *Advanced Lightweight,* 108 S.Ct. at 832. As the Supreme Court observed, an ERISA collection action generally provides a more effective remedy for the trust fund than an unfair labor practice proceeding under the NLRA. *See id.* at 838. This is true, in part, because in an action under the NLRA, the union and the employer can always enter into a settlement waiving the employer's post-contract obligations to contribute to a pension fund. *Id.* It is thus clear that Murrietta's fraud is the cause-in-fact of the liability of Rozay's Transfer to the trust fund in the *Southwest Administrators* case.

## IV

The union and the union's amicus also raise three objections to the remedy that the district court granted: (1) the simultaneous award of rescission and indemnification exceeded the district court's authority under section 301, (2) indemnification for the amount of the judgment entered against Rozay's Transfer in *Southwest Administrators* was improper because Rozay's Transfer could have "reasonably and prudently" avoided incurring the judgment

in that case, and (3) indemnification for the attorneys' fees incurred by Rozay's Transfer in *Southwest Administrators* was improper because the defense of Rozay's Transfer in that case was legally meritless as against the trust fund in both the district court and on appeal and because Rozay's Transfer did not first provide the union with the opportunity to defend Rozay's Transfer against the trust fund in the prior case.

### A.

■ The union's amicus argues that by awarding indemnification and damages as the remedy, the district court exceeded its authority under section 301, the sole jurisdictional basis invoked. According to amicus, section 301 permits only an action for rescission for fraudulent inducement, leaving an award of indemnification or damages for common law fraud beyond the district court's remedial power. Implicit in this argument is the assumption that section 301 permits only contractual-type remedies and that while granting both rescission and *restitution* is a proper contractual remedy, granting both rescission and *indemnification* is not. Because the inability of the district court as a matter of law to rescind the obligation running from Rozay's Transfer to the trust fund makes it impossible literally to restore the parties to their *status quo ante,* the union correctly asserts that the district court's "make-whole" remedy following its order of rescission is more properly characterized as indemnification than as restitution.

Nonetheless, how this court chooses to characterize the remedy granted in this case and whether simultaneously granting rescission and indemnification is a proper "contractual" remedy are irrelevant to the district court's remedial authority under section 301. The union's amicus points to no authority holding that a claim for equitable indemnity or other noncontractual relief is not cognizable under section 301. Contrary to its suggestion that section 301 strictly limits the remedial power of the federal courts, the Supreme Court has con-

strued section 301 as "a congressional mandate to the federal courts to fashion a body of federal common law to be used to address disputes arising out of labor contracts." *Allis–Chalmers Corp. v. Lueck*, 471 U.S. 202, 209, 105 S.Ct. 1904, 1910, 85 L.Ed.2d 206 (1985) (footnote omitted); *see Textile Workers v. Lincoln Mills*, 353 U.S. 448, 456–57, 77 S.Ct. 912, 917–18, 1 L.Ed.2d 972 (1957). In *Lincoln Mills*, the Court held that section 301 allows courts to fashion remedies even though lacking in express statutory sanction and that "[t]he range of judicial inventiveness [under section 301] will be determined by the nature of the problem." 353 U.S. at 457, 77 S.Ct. at 918; *see also Bowen v. United States Postal Service*, 459 U.S. 212, 222, 103 S.Ct. 588, 594, 74 L.Ed.2d 402 (1983) (*Bowen*) ("of paramount importance is the right of the [injured party] ... to be made whole"); *Black–Clawson Co., Inc. v. International Association of Machinists*, 313 F.2d 179, 182 (2d Cir.1962) (*Black–Clawson*) (legislative history of section 301's predecessor contemplates "not only the ordinary lawsuits for damages but also such other remedial proceedings, both legal and equitable, as might be appropriate in the circumstances"). Recognizing that "[t]he label attached to the remedy as tort or contract is not dispositive of the scope of federal common law which under section 301(a) it is our responsibility to create," the Third Circuit in *Wilkes–Barre Publishing Co. v. Newspaper Guild of Wilkes–Barre, Local 120*, 647 F.2d 372, 381 (3d Cir.1981), *cert. denied*, 454 U.S. 1143, 102 S.Ct. 1003, 71 L.Ed.2d 295 (1982), held that a claim for tortious interference with a labor contract was proper under section 301.

■ Other courts have similarly allowed tort-like, "make-whole" remedies similar to the one fashioned by the district court for breach of contract and breach of duty of fair representation claims under section 301. These remedies have included awards for back pay and future losses, *Thompson v. Brotherhood of Sleeping Car Porters*, 367 F.2d 489, 492–93 (4th Cir.1966), *cert. denied*, 386 U.S. 960, 86 S.Ct. 1019, 18 L.Ed.2d 110 (1967), compensatory damages, *see Bowen*, 459 U.S. at

222, 103 S.Ct. 594, and attorneys' fees, *Dutrisac v. Caterpillar Tractor Co.*, 749 F.2d 1270, 1275–76 (9th Cir.1983) (*Dutrisac*). In analogous cases of union misconduct, this court has affirmed an award imposed by the NLRB requiring a union to make an employer whole for financial expenditures coerced from the employer in violation of the NLRA. *See Graphic Arts International Union, Local No. 280 v. NLRB*, 596 F.2d 904, 910 (9th Cir.1979) (*Graphic Arts International*); *NLRB v. Warehousemen's Union Local 17*, 451 F.2d 1240, 1243 (9th Cir.1971) (upholding Board remedial order requiring union to make employer whole for financial expenditures made by employer as result of an unlawfully coerced collective bargaining agreement). The NLRB's "broad discretion in fashioning remedies to effectuate the policies of the NLRA in light of the circumstances of each case," *Graphic Arts International*, 596 F.2d at 910, justified its award of "make-whole" remedies in these cases of union unfair labor practices. No reason has been provided to suggest why, by analogy, the federal district courts' broad remedial powers under section 301 should not similarly invest them with the power to devise "make-whole" remedies, "both legal and equitable, as might be appropriate in the circumstances." *Black–Clawson*, 313 F.2d at 182. Hence, there is no sound reason why section 301 should bar the district court from simultaneously awarding a remedy of rescission and indemnification for the union's fraudulent inducement in order to make the employer "whole."

## B.

■ Taking a different tack, the union next maintains that Rozay's Transfer could have "reasonably and prudently" avoided the judgment entered against it in *Southwest Administrators* if it had done either of two things. First, it argues that Rozay's Transfer could have contacted the union after learning of the trust fund's unfavorable decision by mail on March 24, 1983, for the purposes of reopening negotiations or amending the agreement. We

construe this as a claim that Rozay's Transfer failed to take steps to mitigate its damages. At that time, however, Rozay's Transfer was unaware of any grounds that would have entitled it to reopen negotiations or modify the March 8, 1983, agreement. Murrietta's fraud was not revealed until much later. Further, the union's position in the instant case is completely inconsistent with a desire on its part to renegotiate or amend the March 8, 1983, labor contract to reflect Rozay's Transfer's mistaken understanding of that agreement.

Second, the union suggests that Rozay's Transfer was tardy in waiting over a year before formally notifying the union of the collection action initiated by the trust fund on June 20, 1983. This claim is contrary to the record. While Rozay's Transfer did not file its complaint against the union in this case until after September 26, 1984, the union had actual notice of the *Southwest Administrators* trial from its outset. Moreover, the union does not explain how notice of the trust fund's action against Rozay's Transfer would have resulted in mitigation of damages. Union officials, after all, testified *against* Rozay's Transfer in the *Southwest Administrators* litigation.

Third, the union alleges that had Rozay's Transfer promptly conducted discovery in that case, it would have uncovered Murrietta's fraudulent conduct, and could then have moved at an earlier date to serve a third party complaint against the union seeking rescission. There is, however, no evidence in the record that Rozay's Transfer was remiss or dilatory in conducting discovery. In addition, we held in *Southwest Administrators* that because ERISA was intended to provide "a streamlined and simplified procedure for employee benefit trust funds to collect delinquent contributions," the district court reasonably denied Rozay's application to implead the union. 791 F.2d at 777. The strong policy in favor of avoiding complicated, lengthy trials in ERISA collection actions suggests to us that impleader might well have been denied at any stage of the *Southwest Administrators* proceedings. Moreover, even if the union had been joined as a third party

defendant, Rozay's Transfer still would have been adjudged liable to the trust fund, although it then could have simultaneously sought indemnification from the union. In either event, Rozay's Transfer would not have avoided its primary liability to the trust fund.

### C.

▮ The union also attacks that part of the district court's judgment indemnifying Rozay's Transfer for the attorneys' fees and costs that it incurred in litigating the *Southwest Administrators* case at both the district court and circuit court level. An award of attorneys' fees on the grounds of bad faith is a matter committed to the district court's discretion and will not be reversed absent an abuse of discretion. *Beaudry Motor Co. v. ABKO Properties, Inc.*, 780 F.2d 751, 756 (9th Cir.1986) (*Beaudry Motor*).

According to the union, the theory of defense at trial of Rozay's Transfer and on appeal in *Southwest Administrators* was frivolous and, moreover, Rozay's Transfer failed to provide the union the first opportunity to defend Rozay's Transfer. Therefore, the union reasons, the district court should not have ordered it to indemnify Rozay's Transfer for the attorneys' fees and costs incurred in defending *Southwest Administrators*. We find these arguments to be patently without merit. Merely because a party ultimately loses does not mean that its defense was not in good faith. Indeed, our lengthy discussion of the defense of Rozay's Transfer in *Southwest Administrators* recognized the force of its position, although we were compelled ultimately to reject it as a matter of law. Moreover, the union's apparent fraud was not the only good faith defense that Rozay's Transfer raised in the prior case. *See* 791 F.2d at 775. Last, we know of no authority that requires the victim of intentional fraud to request its defrauder to defend it in a suit brought by a third party. Particularly in this case, the conflicting interests between Rozay's Transfer and the union would have counseled against allowing the union to defend Rozay's Transfer in

the prior lawsuit. The union would hardly have been willing to admit to the fraud of its own agent, thereby subjecting itself to potential liability. Nor could one expect it vigorously to take a position in conflict with the best interests of its members by arguing that Rozay's Transfer was not obligated to make the retroactive pension fund contributions. Indeed, as we have previously observed, the union actively sided with the trust fund in the *Southwest Administrators* litigation.

The award of attorneys' fees and costs in this case merely compensates Rozay's Transfer for one aspect of its out-of-pocket expenses attributable to the union's fraud. Case law supports awarding attorneys' fees and costs where such expenses were incurred as a result of the defendant's own misconduct. *See, e.g., Dutrisac,* 749 F.2d at 1275–76 (holding that award of attorneys' fees in a section 301 suit is proper where fees reimburse an employee for union's failure to represent him at a hearing); *Moe v. Transamerica Title Insurance Co.,* 21 Cal.App.3d 289, 303, 98 Cal.Rptr. 547 (1971) (one who is required by another's tort to defend an action brought by a third party is entitled to recover attorneys' fees on that action, even if unsuccessful). Such an award by the district court is also consistent with the rule that allows a court to award attorneys' fees against a party whose conduct resulting in a lawsuit constituted fraud or who otherwise acted in bad faith. *See F.D. Rich Co. v. United States ex rel. Industrial Lumber Co.,* 417 U.S. 116, 129, 94 S.Ct. 2157, 2165, 40 L.Ed.2d 703 (1974); *Beaudry Motor,* 780 F.2d at 756; *Dogherra v. Safeway Stores, Inc.,* 679 F.2d 1293, 1298 (9th Cir.1982), *cert. denied,* 459 U.S. 990, 103 S.Ct. 346, 74 L.Ed.2d 386 (1982). The union's claim that under *Weston v. Globe Slicing Machine Co.,* 621 F.2d 344, 349 (9th Cir.1980), an indemnitee cannot recover its attorneys' fees from an indemnitor absent an express contractual provision ignores the fact that *Weston* was a diversity action applying Idaho law, and, moreover, that it did not involve, as in this case, the commission of an intentional tort by the indemnitor.

Thus, the district court did not abuse its discretion by awarding Rozay's Transfer the attorneys' fees and costs that it incurred in defending the *Southwest Administrators* lawsuit.

## V

Under section 301 of LMRA, the district court had jurisdiction to entertain this action against the union for fraudulently inducing Rozay's Transfer into signing the March 8, 1983, agreement. On the merits, we hold that in finding the union liable for fraudulent misrepresentation, the district court's findings of fact were not clearly erroneous and its conclusions of law are correct in light of our precedents. Regarding the "causation" issue, we find that under the facts of this case, the fraud interfered with the ability of Rozay's Transfer to bargain for an agreement extinguishing its obligation to make the retroactive pension fund contributions in question even had it not signed the March 8, 1983, agreement. Were it not for Murrietta's oral misrepresentations, Rozay would not have signed the agreement, and without his signature, Rozay's Transfer could have avoided any liability to the trust fund for retroactive pension fund contributions. Thus, we affirm the district court's finding that "but for" the union's fraud, Rozay's Transfer would not have been liable for these contributions. We also find that the district court's simultaneous rescission of the March 8, 1983, agreement and indemnification award for the judgment rendered against Rozay's Transfer in the *Southwest Administrators* case is authorized under section 301 and that the district court did not abuse its discretion by including the attorneys' fees and costs incurred by Rozay's Transfer in defending that previous action.

AFFIRMED.